**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.<br><br>Defendants. | Civil Action No. 1:26-cv-02656 |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' COMBINED MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ... 1

FACTUAL AND LEGAL BACKGROUND ... 3

A. Title X and Its Regulations ... 3

B. The Fiscal Year 2027 NOFO ... 4

C. Plaintiff and Its Claims ... 5

D. One NOFO, Three Lawsuits ... 6

LEGAL STANDARD ... 7

ARGUMENT ... 8

I. NO ARTICLE III CASE OR CONTROVERSY EXISTS, AND THE CLAIMS ARE UNRIPE IN ANY EVENT ... 8

A. This Rubric Creates No Concrete Injury Until It Is Applied to an Application. ... 8

B. Competitor Standing Does Not Eliminate Article III's Requirement of a Present Competitive Disadvantage. ... 11

C. *CSS* Confirms That Plaintiff's Challenge Is Premature. ... 13

D. The Lawfulness of Priority "Alignment" Cannot Be Assessed Until the Agency Scores Applications. ... 14

E. Preparing an Application Is the Routine Cost of Competing. ... 16

F. *Hennepin County* Marks a Line This Case Does Not Cross. ... 18

G. The Three Pending Challenges Confirm That This One Is Premature. ... 20

II. THE NOFO IS NOT FINAL AGENCY ACTION ... 21

III. PLAINTIFF'S APA CLAIMS FAIL ON THE MERITS. ... 22

A. The NOFO Does Not Conflict With the Title X Statute or Regulations (Counts One and Two). ... 23

B. Announcing Priorities in a Competitive Funding Notice Is Not Rulemaking (Count Four). ... 28

C. A Criterion That Yields to Law and Disqualifies No One Is Neither Arbitrary Nor Unfair (Count Three). ... 29

IV. THE SPENDING CLAUSE CLAIM IS INSUBSTANTIAL AND DOES NOT STATE A CLAIM (COUNT FIVE) ... 31

V. ANY RELIEF SHOULD BE NO BROADER THAN NECESSARY ... 33

VI. CONCLUSION ... 34

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967) .......... 1, 13, 17, 20

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) .......... 9

*Am. Mining Cong. v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) .......... 28

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) .......... 7, 9

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) .......... 32

*Barbour v. WMATA*,
374 F.3d 1161 (D.C. Cir. 2004) .......... 33

*Bennett v. Spear*,
520 U.S. 154 (1997) .......... 21

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) .......... 24

*Bondi v. VanDerStok*,
604 U.S. 458 (2025) .......... 7, 28

*Calderon v. Ashmus*,
523 U.S. 740 (1998) .......... 9, 10

*City of Philadelphia v. Att'y Gen.*,
916 F.3d 276 (3d Cir. 2019) .......... 32

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .......... 10

*Clarian Health W., LLC v. Hargan*,
878 F.3d 346 (D.C. Cir. 2017) .......... 28

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
407 F.3d 1220 (D.C. Cir. 2005) .......... 6

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) .......... 32

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .......... 30

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) .......... 29

*Gen. Elec. Co. v. EPA*,
53 F.3d 1324 (D.C. Cir. 1995) .......... 30

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 22

*Hennepin Cty. v. HHS*,
No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026) .......... Passim

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......... 5
*Hurson Assocs., Inc. v. Glickman*,
229 F.3d 277 (D.C. Cir. 2000) .......... 28
*JEM Broad. Co. v. FCC*,
22 F.3d 320 (D.C. Cir. 1994) .......... 28
*Jerome Stevens Pharms., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) .......... 7
*Landor v. La. Dep't of Corr. & Pub. Safety*,
146 S. Ct. 1931 (2026) .......... 31, 32, 33
*Lincoln v. Vigil*,
508 U.S. 182 (1993) .......... 22
*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 8
*Lujan v. Nat'l Wildlife Fed'n*,
497 U.S. 871 (1990) .......... 15
*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007) .......... 10
*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357 (2025) .......... 32
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 29
*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .......... 10, 16
*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) .......... 16, 33
*Nat'l Park Hospitality Ass'n v. Dep't of the Interior*,
538 U.S. 803 (2003) .......... Passim
*Nat'l Treasury Emps. Union v. United States*,
101 F.3d 1423 (D.C. Cir. 1996) .......... 10
*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*,
508 U.S. 656 (1993) .......... 11
*NEA v. Finley*,
524 U.S. 569 (1998) .......... 2, 30, 32
*NYC C.L.A.S.H., Inc. v. Fudge*,
47 F.4th 757 (D.C. Cir. 2022) .......... 33
*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .......... 17
*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) .......... 2, 31, 32, 33
*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) .......... 28
*Planned Parenthood of Wis., Inc. v. Azar*,
316 F. Supp. 3d 291 (D.D.C. 2018) .......... 4, 22, 25, 29
*POET Biorefining, LLC v. EPA*,
970 F.3d 392 (D.C. Cir. 2020) .......... 7

*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952) ........ 9, 10, 21
*Reliable Automatic Sprinkler Co. v. CPSC*,
324 F.3d 726 (D.C. Cir. 2003) ........ 22
*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009) ........ 8
*Reno v. Catholic Social Servs., Inc.*,
509 U.S. 43 (1993) ........ Passim
*Rust v. Sullivan*,
500 U.S. 173 (1991) ........ 33
*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010) ........ 12
*Sierra Club v. Mainella*,
459 F. Supp. 2d 76 (D.D.C. 2006) ........ 7
*Soundboard Ass'n v. FTC*,
888 F.3d 1261 (D.C. Cir. 2018) ........ 21
*South Dakota v. Dole*,
483 U.S. 203 (1987) ........ 2, 31, 33
*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........ 8
*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ........ 10, 11
*Texas v. United States*,
523 U.S. 296 (1998) ........ 9, 15
*Toilet Goods Ass'n, Inc. v. Gardner*,
387 U.S. 158 (1967) ........ 1, 13, 14, 21
*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026) ........ 15
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) ........ 33
*Trump v. New York*,
592 U.S. 125 (2020) ........ 7, 10, 15, 16

**<u>Statutes</u>**

5 U.S.C. § 553(b)(A) ........ 28
5 U.S.C. § 705 ........ 6, 33
42 U.S.C. § 300(a) ........ 3, 22
42 U.S.C. § 300(b) ........ 24
Pub. L. No. 119-75, 140 Stat. 173, 262 ........ 27

**<u>Administrative Rules</u>**

*Ensuring Access to Equitable, Affordable, Client-Centered, Quality Family Planning Services*,
86 Fed. Reg. 56,144 (Oct. 7, 2021) ........ 25

**Regulations**

42 C.F.R. Part 59 .......... 3
42 C.F.R. § 59.2 .......... 3, 25, 26, 31
42 C.F.R. § 59.5 .......... 27
42 C.F.R. § 59.5(a)(1) .......... 26, 27
42 C.F.R. § 59.5(a)(2) .......... 26
42 C.F.R. § 59.5(a)(3) .......... 25
42 C.F.R. § 59.5(a)(4) .......... 25
42 C.F.R. § 59.5(a)(5) .......... 26, 27
42 C.F.R. § 59.7(a) .......... 3, 4, 5, 29, 31

## INTRODUCTION

No one has applied for a Title X grant under the funding announcement ("NOFO") Plaintiff challenges. No application has been scored, no award has been denied, and no grant has been terminated. Plaintiff nonetheless asks this Court to declare, before any application has been submitted or scored, which of the agency's announced priorities its members may disregard.

Two principles resolve this case. Under *Abbott Laboratories*, *Toilet Goods*, and *Reno v. Catholic Social Services, Inc.*, Plaintiff's challenge is premature. And in any event, the challenged priorities do not conflict with the Title X statute or regulations.

**Timing.** The threshold question is not whether the NOFO is lawful but *when* a court may decide that. *Abbott Laboratories* and *Toilet Goods* establish a ripeness line: a rule that commands conduct on pain of penalty may be reviewed when issued, while a rule whose effect awaits an agency's discretionary application may not. 387 U.S. 136 (1967); 387 U.S. 158 (1967). *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43 (1993) ("*CSS*"), places rules on access to discretionary benefits on the second side of that line: a rule that "impose[s] no penalties" but "limit[s] access to a benefit" that is "not automatically bestowed" gives rise to no ripe claim upon promulgation; a claim ripens only when an applicant takes "affirmative steps" it could take before the agency blocks its path "by applying the regulation" to it. 509 U.S. at 58–59. A NOFO is a benefit-access instrument, and the claims here are weaker than the unripe ones in *CSS*, where the regulations categorically disqualified the plaintiffs. These priorities disqualify no one, and no concrete dispute has yet arisen.

This Court drew the same line last month. In *Hennepin Cty. v. HHS*, No. 26-cv-2460 (CRC), 2026 WL 2426300 (D.D.C. Aug. 19, 2026), HHS issued new NOFOs and, three days later, terminated nearly every existing grant under the same policy—agency action already applied, to

grantees whose "path" had been "blocked then and there," *CSS*, 509 U.S. at 63, and whose application window had already closed. Here, Plaintiff's members hold current awards undisturbed through March 2027, no member has applied, the application period remains open until January 11, 2027, and the priorities appear nowhere among the NOFO's grounds for disqualification. A.R. 068, 107–108. This case falls on the other side of the line.

**Merits**. Plaintiff's facial attack fails for the same reason it is unripe. A facial challenge is judged by the document's text, and this text subordinates every priority to the Title X statute and regulations—"where consistent with program authority and the scope of the award," "to the extent authorized by law and within the scope of the program," "where authorized by law." A.R. 077, 080, 111. To establish a conflict, Plaintiff must treat those qualifications as surplusage, convert a scoring emphasis into a substantive command, and litigate its own labels rather than the NOFO's words. The NOFO contains no "Anti-Contraception" or "Biological Reality" priority. It states priorities on reducing overmedicalization and promoting evidence-based care, whose operative verbs are "integrate," "offer," "support," and "expand access," and which never direct any applicant to prioritize one method, message, or service over another.

Plaintiff's remaining theories are derivative of conflicts that do not exist. The fair-notice claim asks for advance clarity that no doctrine supplies to competitors for discretionary funds, *NEA v. Finley*, 524 U.S. 569, 589 (1998), and cannot be reconciled with insistence that the same priorities conflict clearly with the regulations. And the Spending Clause count is insubstantial: the clear-notice rule of *Pennhurst* and *Dole* governs what Congress may demand of recipients of accepted federal funds, not what criteria agencies will use to select among applicants for money no one has been offered. 451 U.S. 1, 17, 25 (1981); 483 U.S. 203, 207 (1987).

This is the second of three lawsuits, in three adjoining districts, asking three federal courts to decide the same question about the same document. On June 18, the national association of Title X grantees challenged the NOFO in the Middle District of Pennsylvania; that case is fully briefed and supplementally briefed at the court's direction on *CSS*; on September 9 the court canceled oral argument "so that the court can first resolve Defendants' motion to dismiss." Order, *Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*, No. 1:26-cv-1684-JPW (M.D. Pa. Sept. 9, 2026) ("*NFPRHA*"), Dkt. 71. On August 27, twenty-one States and two Governors initiated a third suit in the District of Maryland, tracking this complaint claim for claim. *New York v. HHS*, No. 1:26-cv-03405-DLB (D. Md.) Applications are due January 11, 2027; awards issue April 1, 2027; and the grants that fund Plaintiff's members today expire at the end of March.

Plaintiff asks the Court to strike a third of the scoring rubric for that competition, in the middle of its application period, on behalf of members who have not yet applied. The Court need not decide whether any priority is lawful. It should hold that the question is not yet presented.

The Court should dismiss the action as unripe or in the alternative, enter judgment for Defendants.

## FACTUAL AND LEGAL BACKGROUND

### A. Title X and Its Regulations

Title X of the Public Health Service Act authorizes the Secretary to make grants "to assist in the establishment and operation of voluntary family planning projects." 42 U.S.C. § 300(a). Grants are competitive and discretionary. The statute directs the Secretary to award them "in accordance with such regulations as the Secretary may promulgate," and the implementing regulations, 42 C.F.R. Part 59, set the criteria for project grants. Section 59.7(a) lists the factors the Secretary considers in awarding funds—among them the applicant's ability to advance "health equity," § 59.7(a)(3), a term § 59.2 defines. Section 59.5 prescribes what funded projects must

provide, including a "broad range of acceptable and effective family planning methods," § 59.5(a)(1), delivered without discrimination, § 59.5(a)(4), with nondirective pregnancy counseling, § 59.5(a)(5).

Nothing in the regulations has changed. The NOFO recites them section by section and hyperlinks them. A.R. 078–79.

**B. The Fiscal Year 2027 NOFO**

Program priorities are a longstanding feature of Title X administration, announced in every funding announcement alongside the statutory and regulatory criteria. Compl. ¶ 47 (HHS has issued Title X NOFOs "[s]ince at least 1990"). From 2003 to 2011, announcements emphasized abstinence counseling; from 2004 to 2009, partnership with faith-based organizations; and in 2018, 35 of 100 merit-review points were allocated to priority alignment, which is the same allocation as here. *See Planned Parenthood of Wis., Inc. v. Azar*, 316 F. Supp. 3d 291, 297 (D.D.C. 2018) (describing history of Title X priorities), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

The operative NOFO issued on July 9, 2026. Compl. ¶ 5 & Ex. 1. Statutory and regulatory requirements come first: "[a]ll funded activities must be in compliance with the requirements of the Title X statute, legislative mandates, and regulations." A.R. 073, 078. The priorities come second and operate "[i]n addition to the statute, regulations, legislative mandates, and additional program guidance that apply to Title X." A.R. 080 (emphasis added). Alignment with priorities is required only "where consistent with program authority and the scope of the award," "to the extent authorized by law and within the scope of the program," and "where authorized by law and within the scope of the program." A.R. 077, 080, 111. The NOFO enumerates Office of Population Affairs (OPA) priorities applicants must address, with "key strategies" for each, A.R. 080–84, and confines alignment with "HHS and OASH priorities" to what is "authorized by law and within the scope of the program." A.R. 111. The OASH priorities statement promises implementation

"consistent with applicable laws, regulations, court orders, and any required procedures," A.R. 136.

Priority alignment is a scoring consideration, not an eligibility requirement. Merit review allocates 100 points: 25 to local need and capacity, 15 to statutory and regulatory compliance, 20 to management, 5 to budget, and 35 to strategies advancing "OPA's program priorities as discussed in Section C(a)(4)(i)"—a cross-reference to the section whose first sentence confines alignment "to the extent authorized by law and within the scope of the program." A.R. 109–10, 080. The grounds on which an application may be disqualified are a closed set: "eligibility, responsiveness, formatting, and submission requirements." A.R. 076. Priority alignment is not among them. Final funding levels are set "according to the criteria set forth in Title X regulations at 42 C.F.R. § 59.7(a)." A.R. 111. An earlier April version of the announcement had provided for an "Alignment Review" under which a senior official would render a final, non-appealable eligibility determination based on priority alignment; the July NOFO removed it. A.R. 041.

### C. Plaintiff and Its Claims

Plaintiff is a membership organization. Compl. ¶¶ 9–10. It sues "on behalf of its members that intend to apply for the next cycle of Title X funding," seven of which are current direct grantees and others of which are subgrantees. *Id.* ¶¶ 11–12; *see id.* ¶ 177 (invoking *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). No member has applied, but several "plan to apply." *Id.* ¶ 148; *see id.* ¶ 178. Plaintiff nonetheless alleges present injury because members "must decide well in advance of the January 2027 application deadline whether to apply and commit resources to the planning, scoping, internal approval, and application pre-drafting processes," *id.*, and the NOFO's criteria are "hampering and burdening members' current decision-making," *id.* ¶ 179. Its challenge is "purely legal." *Id.* ¶ 180.

The complaint identifies four sets of OPA priorities—those Plaintiff labels "Biological Reality," "Marriage and Parenthood Counseling," "Anti-Contraception," and "Life Affirming Program Delivery"—together with "all unspecified HHS and OASH priorities," and pleads five counts: contrary to law (Count One, ¶¶ 181–86), in excess of statutory authority (Count Two, ¶¶ 187–91), arbitrary and capricious (Count Three, ¶¶ 192–96), procedurally defective for want of notice and comment (Count Four, ¶¶ 197–202), and in violation of the Spending Clause (Count Five, ¶¶ 203–08). Compl. ¶¶ 74–75, 87, 100, 107, 120–45. Plaintiff seeks vacatur of the priorities' incorporation in the NOFO, an injunction against "imposing" or "implementing" them at any stage of application or grant administration, and postponement under 5 U.S.C. § 705. *Id.* ¶¶ 211–13 (Prayer for Relief). The labels are Plaintiff's own. The NOFO titles the priorities "Reducing overmedicalization in health care," "Promoting body and health literacy," "Promoting evidence-based care," "Advancing reproductive goals counseling," and "Enforcing the Hyde Amendment." A.R. 081–085.

**D. One NOFO, Three Lawsuits**

Three suits challenge this NOFO on its face.[1] First, *NFPRHA*, No. 1:26-cv-1684-JPW (M.D. Pa.) (filed June 18, 2026), in which the plaintiffs moved for summary judgment shortly after filing their complaint, *id.* Dkt. 23 (original motion filed July 2, 2026 prior to amending complaint), cross-motions are fully briefed, *id.* Dkts. 47, 51, 60, 67, the court sua sponte ordered supplemental briefing on *CSS*, *id.* Dkts. 62, 68, 69. Second, this action, filed July 28, 2026, over a month after *NFPRHA*. Dkt. 1, Compl. And third, *New York v. HHS*, No. 1:26-cv-03405-DLB (D. Md.), filed August 27, 2026, one month after this action, brought by twenty-one States and two Governors on

[1] The Court may take judicial notice of the filings in the other two actions. *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005).

the same theories against the same priorities, in which Defendants' motion to transfer is pending. *Id.* Dkt. 46.

The plaintiff groups appear to overlap. Plaintiff here sues "on behalf of its members," Compl. ¶ 12; the association in *NFPRHA* sues on behalf of roughly 800 members that include Title X grantees in 45 States, *NFPRHA* Dkt. 35, Am. Compl. ¶¶ 11, 13–14; and the States in *New York* sue on behalf of the state health agencies through which they receive Title X funds. *New York* Dkt. 1, Compl. ¶¶ 70–71.

Each complaint disclaims any challenge to an actual application or award.

## LEGAL STANDARD

**Timing.** Ripeness is a threshold timing barrier to the exercise of federal jurisdiction. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 403 (D.C. Cir. 2020). It has an Article III component related to "imminent" or "certainly impending" rather than contingent injury, and a prudential one that focuses on "the fitness of the issues for judicial decision" and the "hardship to the parties" of withholding court consideration. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 386–87 (D.C. Cir. 2012) (quotation omitted). On a motion under Rule 12(b)(1), the Court may consider materials outside the pleadings. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Dismissal for want of ripeness is without prejudice.

**Merits.** Because Plaintiff sued before any FY 2027 application has been submitted or scored, its contrary-to-law theory is facial. A facial challenge is judged by the instrument's terms, not by predictions about its administration. *See Bondi v. VanDerStok*, 604 U.S. 458, 467–68 & n.2 (2025); *cf. Trump v. New York*, 592 U.S. 125, 131 (2020). In an APA suit, summary judgment is the mechanism for deciding, on the administrative record, whether the agency acted within the law. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). The Court does not find facts

but determines APA compliance as a matter of law. *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009).

## ARGUMENT

### I. NO ARTICLE III CASE OR CONTROVERSY EXISTS, AND THE CLAIMS ARE UNRIPE IN ANY EVENT

Ripeness is a jurisdictional issue that should be addressed before the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998). A court may not assume jurisdiction to reach the merits, *id.*, and the burden of establishing jurisdiction rests on the party invoking it, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

Two grounds are presented, and the first does not depend on the second. Sections A and B show that no Article III case or controversy exists, because the challenged priorities have inflicted no concrete competitive injury on Plaintiff's members, and no decree entered today would resolve a concrete dispute over their application. The remaining sections show that, under the prudential inquiry, the *Abbott Laboratories* factors point the same way.

Defendants address the merits in Parts III and IV, but do so without conceding that any question presented is ripe. Defendants respectfully request that the Court resolve this Part first and reach the remaining Parts only if it concludes that a case or controversy exists.

#### A. This Rubric Creates No Concrete Injury Until It Is Applied to an Application.

The defect here is constitutional. The NOFO imposes no penalty, excludes no one, subordinates every priority to the statute and regulations, and cannot affect any applicant's competitive position through the challenged criteria until applications are submitted and scored. Until then there is no dispute of the kind Article III describes. Article III extends the judicial power to "Cases" and "Controversies": disputes that are "definite and concrete, touching the legal relations of parties having adverse legal interests" and admit "of specific relief through a decree

of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937). A disagreement about agency policy is not such a controversy until it "has taken on fixed and final shape." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952). And a claim that "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all" is not ripe. *Texas v. United States*, 523 U.S. 296, 300 (1998); *Am. Petroleum Inst.*, 683 F.3d at 386–87.

On the proposition that Title X applicants and grantees remain governed by the statute and regulations, the NOFO answers as Plaintiff would. A.R. 073, 077, 078, 080, 111. The parties disagree instead about how priorities might affect a future application—an issue that has not "taken on fixed and final shape." *Wycoff*, 344 U.S. at 244.

Nor would a decree issued now conclusively resolve any concrete dispute between HHS and a particular applicant. The concrete dispute between HHS and a Title X applicant takes shape through an application, its assessment, and an award decision. None exists. Article III does not permit parties to obtain, in advance, a ruling on the rules that will govern a future proceeding between the same parties. In *Calderon v. Ashmus*, 523 U.S. 740 (1998), a class of capital prisoners sought a declaration—before filing any habeas petition—that California did not qualify for the expedited procedures of Chapter 154. Their stake was concrete, the parties were adverse, and the Declaratory Judgment Act authorized the action. A unanimous Court nonetheless held the suit "not a justiciable case within the meaning of Article III," because a judgment "would not resolve the entire case or controversy as to any one of them, but would merely determine a collateral legal issue governing certain aspects of their pending or future suits." *Id.* at 747. The action, the Court explained, "attempt[ed] to gain a litigation advantage by obtaining an advance ruling." *Id.* at 749.

Just so here. On the Complaint's own telling, the controversy between HHS and Plaintiff's members is about whether they should apply, how their applications will be scored, and who will be funded. Dkt. 1, Compl. ¶¶ 178–80. A ruling now would similarly resolve in advance a legal issue governing a future grant proceeding before the circumstances in which that issue matters have arisen.

How Plaintiff frames the request does not change the analysis. No statute, including the Declaratory Judgment Act or the APA, can supply a case where Article III does not. *Calderon*, 523 U.S. at 749. What Plaintiff seeks is a compliance opinion: a declaration, before any application, of which priorities its members must satisfy and which they may disregard. The D.C. Circuit told a Title X association what to do: "inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot," *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006), as opposed to "preliminary findings and conclusions intended to fortify the litigant against future regulation" from a court. *Wycoff*, 344 U.S. at 246–47.

Article III ripeness and the imminence element of standing "boil down to the same question." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 n.5 (2014) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8 (2007)); *see Trump v. New York*, 592 U.S. at 131. And Defendants' answer is the same in either framing. Defendants do not dispute that Plaintiff's members have an interest in the fiscal year 2027 competition. They dispute that any injury from the *application* of a challenged priority is "certainly impending" rather than contingent on events that have not occurred. *See* Part I.D, *infra*; *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–31 (D.C. Cir. 1996) (Line Item Veto Act challenge constitutionally unripe before any cancellation). And because the

defect is constitutional, no balancing of fitness against hardship can excuse it, and the Court may not proceed to the merits notwithstanding it. *Cf. Susan B. Anthony List*, 573 U.S. at 167.

**B. Competitor Standing Does Not Eliminate Article III's Requirement of a Present Competitive Disadvantage.**

Plaintiff may answer that competitor injury can arise before an award decision, because the injury is the "inability to compete on an equal footing," *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993), and this Court applied that principle in *Hennepin County*, 2026 WL 2426300, at *10. Defendants do not dispute that a competitor may sometimes sue before applying. But Plaintiff has identified no present inequality in the opportunity to compete.

Begin with the Complaint. It states costs of "planning, scoping, internal approval, and application pre-drafting," Compl. ¶ 178; interference with members' "current decision-making," *id.* ¶ 179; and a "competitive distortion" that "cannot be undone" once final awards issue, *id.* ¶ 180. The first two are the ordinary costs of competing for a discretionary grant. They work no cognizable hardship. *See* Part I.E, *infra*. The third is the loss of funding, which does not occur until an application is scored and an award is made.

Even assuming the Complaint adequately alleges an equal-footing injury, no unequal footing presently exists. Every prospective applicant in this competition faces the same announcement, the same criteria, and the same 100-point rubric. No member is excluded, assigned to a disfavored class, or required to satisfy a standard others need not satisfy. Whether a member ends up disadvantaged depends on what applicants propose and how panels score proposals against others: events yet to occur. An inequality that exists only if the agency creates it in scoring based on what is presented is not a remediable, present, concrete injury.

*CSS* marks the same difference. The Court distinguished *Northeastern Florida* on the ground that the injury there was "the inability to compete on an equal footing in the bidding process, not the loss of a contract," and it explained that where access to a benefit is "conditioned on several nontrivial rules other than the two challenged," the effect of the challenged rules is "much more difficult to predict firmly." 509 U.S. at 58 n.19. That second observation describes this competition. Title X funding turns on the statutory and regulatory requirements, on the 65 of 100 merit points that have nothing to do with the priorities, and on a discretionary judgment among competing proposals. A.R. 078–80, 109–11.

Instruments in competitor-standing cases differ from this one in that respect. The set-aside in *Northeastern Florida* reserved a fixed percentage of contracts by its own force, so the disadvantage was complete when the ordinance took effect, without any official exercising judgment. So too in *Sherley v. Sebelius*, 610 F.3d 69, 72–74 (D.C. Cir. 2010). In that case, the instrument enlarged the pool of eligible applicants the day the guidelines issued. And the NOFOs in *Hennepin County* operated by their own terms: "If an application does not align [], the application will not receive funding." 2026 WL 2426300, at *18. Each of those instruments changed the competitive position of the plaintiff on the day it took effect. Here, the challenged criteria do not by their own force. They operate only when a panel applies them to a proposal, and the NOFO confines them to what the law allows. A.R. 077, 080, 111.

That is also where *Hennepin County* leaves this case behind. The plaintiffs there could not have applied: the application deadline had passed, and the NOFOs made alignment a prerequisite to funding. 2026 WL 2426300, at *5, *10, *18. Here the window is open until January 11, 2027, the priorities disqualify no one, and nothing has been applied to anyone.

The sections that follow are in the alternative, under the traditional prudential framework of *Abbott Laboratories*, and reach the same result.

### C. *CSS* Confirms That Plaintiff's Challenge Is Premature.

*Abbott Laboratories* and *Toilet Goods* establish a ripeness line. On the ripe side of the line, a regulation that commands primary conduct on pain of penalties may present a dispute fit for immediate review, because it "require[s] an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance." *Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967). On the unripe side, a regulation whose effect awaits discretionary application does not: where a court has "no idea whether or when" the agency will act and "primary conduct" is unaffected, review "stand[s] on a much surer footing in the context of a specific application." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967).

*CSS* establishes that rules governing access to a benefit generally fall on the unripe side. There, the plaintiff classes were defined as aliens whom INS regulations rendered ineligible for the legalization program of the Immigration Reform and Control Act. The Supreme Court nonetheless held their regulatory challenge unripe:

> The regulations challenged here fall on the latter side of the line. They impose no penalties for violating any newly imposed restriction, but limit access to a benefit created by the Reform Act but not automatically bestowed on eligible aliens. Rather, the Act requires each alien desiring the benefit to take further affirmative steps, and to satisfy criteria beyond those addressed by the disputed regulations. It delegates to the INS the task of determining on a case-by-case basis whether each applicant has met all of the Act's conditions, not merely those interpreted by the regulations in question. In these circumstances, the promulgation of the challenged regulations did not itself give each . . . class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the regulation to him.

509 U.S. at 58–59. A benefit-access rule presents none of *Abbott*'s "immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties." *Id.* at 57. Its impact cannot "be said to be felt immediately by those subject to it in

conducting their day-to-day affairs." *Id.* at 58 (quoting *Toilet Goods*, 387 U.S. at 164). After *CSS*, the Court further explained that even a final, "purely legal" agency pronouncement that "do[es] not command anyone to do anything" is unripe before it is applied. *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 808–12 (2003) (quotation omitted).

Every sentence of that reasoning maps onto this NOFO. The 2027 NOFO "impose[s] no penalties." It states terms of access to a discretionary grant not "automatically bestowed" on anyone, and it requires each applicant "to take further affirmative steps"—prepare and submit an application—"and to satisfy criteria beyond those addressed by the disputed" priorities: the statutory and regulatory requirements the NOFO lists first, and the enumerated review criteria worth all 100 available points. A.R. 078–80, 109–11. It then commits to HHS "the task of determining on a case-by-case basis" which applications merit funding. Under *CSS*, no prospective applicant's claim ripens until it takes "affirmative steps that [it] could take before" HHS "block[s its] path by applying the regulation to [it]." 509 U.S. at 59. Here, no member has applied, and no priority has been applied to anyone.

The argument for ripeness the Court rejected in *CSS* was stronger than the one pressed here. The *CSS* regulations disqualified the class members outright. Their claims were unripe until they applied. The priorities here disqualify no one. The NOFO's disqualification grounds are "eligibility, responsiveness, formatting, and submission requirements," A.R. 076, and the priorities are not among them. That reasoning applies with at least equal force here, where the challenged priorities do not bar eligibility at all.

### D. The Lawfulness of Priority "Alignment" Cannot Be Assessed Until the Agency Scores Applications.

Plaintiff brings a "purely legal" challenge. Compl. ¶ 180. But *National Park Hospitality* forecloses the premise that a purely legal question is for that reason a ripe one: the regulation there

presented a "purely legal" question, was conceded to be final agency action, and was unripe all the same. 538 U.S. at 812. So were the challenges in *CSS*, which attacked regulations as impermissible constructions of a statute. 509 U.S. at 47.

The premise is also wrong on its own terms. Whether any priority collides with any Title X regulation depends on what an application proposes and how a review panel weighs it—on "some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm" it. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Until then, the claims "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all," *Texas*, 523 U.S. at 300, and any judgment would be "riddled with contingencies and speculation," *Trump v. New York*, 592 U.S. at 131. Article III asks no less. Plaintiff's theory of injury from unlawful application requires that a member apply and that a review panel score its proposal lower on a priority.

The Supreme Court applied that principle weeks ago to a directive qualified in the way this NOFO is qualified. Staying an injunction against an Executive Order whose provisions operated "[t]o the extent feasible and consistent with applicable law," the Court held that "[a]ny prediction how the Executive Branch might eventually implement" them was "no more than conjecture at this time," and that "Article III prohibits federal courts from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, No. 26A124, 2026 WL 2473573, at *2 (U.S. Aug. 24, 2026) (per curiam) (staying injunction pending appeal). Plaintiff's theory sits atop the same stack. *DSCC v. Trump*, No. 26-5193 (D.C. Cir. July 28, 2026) (per curiam) (unpublished), points the same way, affirming a denial of a preliminary injunction against an executive order because the order "repeatedly direct[ed] that any action taken under it must be both 'feasible' and 'consistent with applicable law'," qualifiers with "real bite" that made "[a]ny

prediction" of how the agencies would implement it "no more than conjecture." Slip op. at 7 (quoting *Trump v. New York*, 592 U.S. at 131).

The NOFO's alignment duty is similarly qualified: "where consistent with program authority and the scope of the award," "to the extent authorized by law and within the scope of the program," "where authorized by law." A.R. 077, 080, 111. The OASH priorities statement adds that the priorities will be implemented "consistent with applicable laws, regulations, court orders, and any required procedures," A.R. 136. Plaintiff assumes the agency will read those limits out of its own document. Article III does not permit jurisdiction to rest on that assumption, and the D.C. Circuit has expressly recognized that "a court should reject a facial challenge, either as unripe or meritless, when the challenger's success turns on the assumption that the agency will exercise its discretion unlawfully." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998). Thus, the possibility that a reviewer might disregard the NOFO's limits cannot fill the jurisdictional gap.

Finally, the NOFO supplies a channel for pre-application questions: a program office for questions about "program requirements," a November 9 technical-assistance webinar, and a published FAQ. A.R. 105, 121.[2] Plaintiff has not used it. *See Gonzales*, 468 F.3d at 831.

**E. Preparing an Application Is the Routine Cost of Competing.**

The Complaint asserts injuries of "planning, scoping, internal approval, and application pre-drafting," Compl. ¶ 178, and uncertainty about what alignment requires, *id.* ¶ 179. Tailoring an application to announced criteria is the ordinary condition of competing for discretionary grants,

[2] Prospective applicants may submit questions to the Agency and the Agency will respond to each applicant's questions prior to the application deadline in the form of an FAQ. *See, e.g.*, https://opa.hhs.gov/grant-programs/funding-opportunities#TitleX (prior Title X FAQs). This ensures that all applicants have access to the same information.

and it exists under any NOFO. *Ohio Forestry* rejected a similar hardship assertion: a plan that did "not command anyone to do anything" worked no cognizable hardship even though it obliged the plaintiff to expend resources preparing for the proceedings to follow. *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733–34 (1998). "Mere uncertainty as to the validity of a legal rule" is not hardship either. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811. "[A] possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action." *Abbott Labs.*, 387 U.S. 136, 153 (1967).

Nor does the January 11 deadline supply what the alleged injuries lack. The Reform Act in *CSS* gave applicants a single twelve-month window, fixed by statute, *see* 509 U.S. at 67 (O'Connor, J., concurring in the judgment) (describing the twelve-month statutory interval)—and the Court held the claims unripe notwithstanding that window.[3] A funding deadline four months away exerts no more force than a statutory one.

The *Abbott* side of the line is not present here. Current awards run undisturbed through March 2027, and the Complaint identifies no term of any existing grant the NOFO alters. And Plaintiff's assertion that "[o]nce final awards issue, the competitive distortion cannot be undone," Compl. ¶ 180, is wrong. If a priority is unlawfully applied to a member's application, § 706 review can be had on a record, and § 705 relief is available then and before awards, which do not issue until April 2027. Nor does the NOFO's statement that award decisions are "final and unappealable" *within the agency*, A.R. 112, supply hardship. That identifies the moment at which agency action becomes reviewable in court, which runs counter to a need for earlier review.

[3] Justice O'Connor concurred in the judgment only and "would not . . . reach this result on ripeness grounds." 509 U.S. at 67. Her view rested on the application period having *closed*, so that denial of a late application had become "certain." *Id.* at 72. Nothing here has closed.

### F. *Hennepin County* Marks a Line This Case Does Not Cross.

In *Hennepin County*, HHS issued new Teen Pregnancy Prevention Program NOFOs and, three days later, terminated nearly every existing TPP grant, expressly invoking the new priorities. 2026 WL 2426300, at *5. The challenged action included both the NOFOs and "the termination of almost all existing TPP programs," *id.* at *7–8, and the terminations ran through the decision—standing, *id.* at *9–11; vagueness, *id.* at *20–21; irreparable harm, *id.* at *24–26. The 2026 policy was not "tentative," *id.* at *7, and had a real, present concrete impact because the agency had already executed it against every grantee. The NOFOs also operated as gates: "If an application does not align [], the application will not receive funding." *Id.* at *18. And *Hennepin County* plaintiffs could no longer apply at all: the application deadline had passed before the Court ruled, and the Court found standing on a competitor theory notwithstanding. *Id.* at *10. The criteria there had foreclosed the plaintiffs as completely as they ever would. *CSS* describes this as the "front-desked" applicant, whose path is blocked "then and there" and whose challenge "should not fail for lack of ripeness." 509 U.S. at 63.

Agency action already producing a concrete effect—a termination or an operative funding gate—presents a materially different ripeness question from criteria whose challenged effect awaits an application, a panel, and discretionary judgment. This Court's own description of the TPP NOFOs as "forward-looking, setting forth a multifaceted rubric against which future TPP applicants are to be assessed," 2026 WL 2426300, at *8, describes an instrument on the unripe side of that line. What placed *Hennepin County* on the other side is the sentence that follows: "But HHS did not stop there." *Id.* Three days later, HHS terminated nearly every existing grant. Here, HHS stopped there.

The clearest evidence that this NOFO does not cross that line is that the agency drew the line itself. An earlier April version of this announcement provided for an "Alignment Review,"

under which a senior official would make a final, non-appealable determination of an applicant's eligibility based on priority alignment. A.R. 041. HHS removed that provision. The operative July NOFO makes alignment one component of merit scoring worth 35 of 100 points, A.R. 109–11, and states narrow grounds on which an application may be disqualified, A.R. 076. Priority alignment is not grounds for disqualification. An agency that considered making alignment an eligibility gate and then removed that gate has not retained the feature of the *Hennepin County* NOFOs most relevant to ripeness here.

The statutory setting differs as well. Congress had structured the TPP program itself, directing that not less than 75 percent of appropriated funds replicate programs "proven effective through rigorous evaluation" and the remainder fund research and demonstration. The 2026 TPP NOFOs departed from that design, and the Court's analysis identified potential statutory conflicts. 2026 WL 2426300, at *2–3, *21–22. Title X is different. Section 300(a) authorizes grants "in accordance with such regulations as the Secretary may promulgate," and the priorities a funding announcement may emphasize are left to the Secretary, as they have been for every announcement since 1990. *See* Part III.A, *infra*. And where the TPP NOFOs restructured the program, 2026 WL 2426300, at *23–24, this NOFO leaves the program's structure, project requirements, and service obligations where the regulations put them. A.R. 085, 090, 093–94. It does not restrict the range of services applicants may provide within the statute and regulations: nothing prevents the applicants from providing any particular kind of contraception or disqualifies them from competing for a grant.

In this case, no grant has been terminated, and no condition disqualifies Plaintiff's members. Plaintiff may say *Hennepin County* "delineated" the NOFOs from the terminations, 2026 WL 2426300, at *8, and found the NOFOs reviewable on their own. That is finality, not

ripeness: a pronouncement can be consummated, final, and purely legal, and still be unripe until applied. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812.

**G. The Three Pending Challenges Confirm That This One Is Premature.**

Ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies," *Abbott Labs.*, 387 U.S. at 148, and protects the agency "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way," *id.* at 148–49. Both concerns are present here. Courts do not issue advisory opinions by announcing them. They issue them by accepting a plaintiff's characterization of its challenge as "purely legal," taking cross-motions directed to the merits on a record that contains no application, and deciding what a document would mean if it were someday applied in a way the agency has not applied it. The plaintiff groups challenging this NOFO proposed exactly that sequence: in the Middle District of Pennsylvania by moving for summary judgment shortly after filing the complaint, *NFPRHA*, Dkt. 23, and here by proposing that Plaintiff's motion for summary judgment be briefed simultaneously with Defendants', and advising that if the Court declined, Plaintiff would "move for summary judgment imminently." Dkt. 19 at 4. In both, Defendants asked that the threshold question be decided first while Plaintiffs sought a quick judgment on the merits. The Middle District, presented with the same cross-motions on the same document, set the ripeness question for decision first. Order, *NFPRHA* Dkt. 71 (M.D. Pa. Sept. 9, 2026).

Three courts in three circuits, asked by overlapping plaintiff groups to resolve the same hypothetical, will not necessarily resolve it the same way. And with that, the agency may be left to administer a single national competition under inconsistent instructions about criteria it has not applied to anyone.

The cost is not procedural. Because no application exists, merits briefing on both sides concerns hypotheticals—what a review panel would do with a proposal no one has written, what "alignment" would be taken to mean—and the government must defend its announcement against hypothetical readings the agency has never adopted. That is why review of a benefit-access rule "stand[s] on a much surer footing in the context of a specific application," *Toilet Goods*, 387 U.S. at 164, and why a dispute must take "fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Wycoff*, 344 U.S. at 244. A dispute that awaits the agency's application of its policy arrives in a concrete form the challenger did not choose: a particular applicant, a particular proposal, a particular decision, and a record of what the agency did. This one arrives in a hypothetical form the challenger designed.

Ripeness goes to when, not whether. Should HHS ever block a member's application, review will be available then, on a record of an actual application actually assessed, and § 705 relief will be available then too. *CSS*, 509 U.S. at 59. Until then, there is no dispute concrete enough to adjudicate, and the Complaint should be dismissed without prejudice.

## II. THE NOFO IS NOT FINAL AGENCY ACTION

If the Court dismisses the Complaint as unripe, it need not reach § 704. A pronouncement may be final yet still present an unripe challenge. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812. But if the Court reaches it, the NOFO and priorities in this case fail *Bennett*'s second prong.

Final agency action must determine rights or carry legal consequences. *Bennett v. Spear*, 520 U.S. 154, 178 (1997). This funding announcement determines no applicant's entitlement to funds and imposes no legally binding obligation on applicants. Rather, it states considerations the agency will weigh when applications arrive. This Circuit asks whether the action carries "direct and appreciable legal consequences," *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir.

2018), and treats statements of how an agency intends to exercise discretion in future proceedings as non-final, *Reliable Automatic Sprinkler Co. v. CPSC*, 324 F.3d 726, 731–32 (D.C. Cir. 2003). The one decision to consider a Title X NOFO's priority criteria held them not final for exactly that reason. *Planned Parenthood of Wis.*, 316 F. Supp. 3d at 300–07.

*Hennepin County*'s contrary conclusion rested on NOFOs that also functioned as gates: "If an application does not align [], the application will not receive funding," 2026 WL 2426300, at *18. To this end, each of the cases cited by the Court in *Hennepin County* concerned challenges to eligibility requirements and automatic disqualifiers. Here, the challenged priorities neither determine eligibility nor alter existing grants, and any direct legal consequence for an applicant arises through the later award decision.

## III. PLAINTIFF'S APA CLAIMS FAIL ON THE MERITS.

Should the Court reach the merits, Defendants are entitled to summary judgment on the administrative record. The scope of that review is narrow. Title X commits the award of grants to the Secretary "in accordance with such regulations as the Secretary may promulgate," 42 U.S.C. § 300(a), and § 59.7(a) lists unweighted factors the Secretary must take into account. A court may ask whether a selection criterion conflicts with the statute or regulations—that is, whether the Secretary has taken into account the statutory and regulatory factors. It may not re-weight lawful considerations, however, because the allocation of discretionary program funds among lawful objectives is committed to the agency. *Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993); *see Heckler v. Chaney*, 470 U.S. 821, 830–31 (1985) (no review where there is "no meaningful standard against which to judge the agency's exercise of discretion").

Thus, whether a proposal advancing health equity as § 59.2 defines it should earn 30 points or 35 is not an answerable question under the APA. The question it does supply—whether the priorities require what the law forbids—is answered by the text.

Three features of the NOFO are dispositive. First, the priorities' operative verbs are "integrate," "offer," "support," and "expand access," and the word "prioritize" appears three times in the priorities section, each time with HHS or OASH as its subject. A.R. 081–084. Second, the grounds on which applications may be disqualified are a closed set: "eligibility, responsiveness, formatting, and submission requirements"; priority alignment is not among them. A.R. 076. Third, and confirming the first two, the priorities are subordinate to law: the NOFO requires compliance with the statute, "legislative mandates," and regulations, A.R. 073, 078; introduces the priorities "[i]n addition to" them, A.R. 080; and confines alignment to what is "authorized by law and within the scope of the program," A.R. 077, 080, 111.

The first feature disposes of the conflict counts, because a scoring preference that does not itself require an unlawful practice does not facially conflict with regulations (Part III.A). The first and second dispose of the notice-and-comment count, because a statement of emphasis that binds or disqualifies no one amends nothing (Part III.B). And the second and third dispose of the arbitrary-and-capricious and fair-notice theories, because a criterion that disqualifies no one and yields to law wherever the two meet is neither unexplained nor a trap (Part III.C).

### A. The NOFO Does Not Conflict With the Title X Statute or Regulations (Counts One and Two).

A facial conflict claim requires a challenger to identify text in the challenged instrument that requires what text in the statute or regulations forbids. Questions are not conflicts, and conditionals are not commands.

Plaintiff's method has two recurring defects. First, it litigates its own labels rather than the NOFO's text: the NOFO contains no "Anti-Contraception" priority, but priorities on "[r]educing overmedicalization" and "[p]romoting body and health literacy," which the Complaint renames and attacks under the name it assigned. Compl. ¶ 75; *see also* A.R. 081–084 (same for Plaintiff's

three other labels). Second, the conflict theory rests on an equation the NOFO never makes: that a priority *of the agency* is a mandate that the *grantee* prioritize. Each of the three times the NOFO uses "prioritize" in the priorities section, the subject is HHS or OASH deciding what to fund. A.R. 083–084 ("HHS will prioritize funding for grantees who . . ."; "OASH will prioritize programs and funding that . . . ."). Not once does it direct an applicant to prioritize or deprioritize any service, method, or message. Plaintiff's allegations that the priorities "require applicants and grantees to *prioritize* certain types of family planning over others," Compl. ¶¶ 77, 79, and to "counsel patients in a way that discriminates," *id.* ¶ 89, quote no sentence that says so, because none does.

The NOFO's architecture confirms what its verbs establish. It repeatedly requires compliance with the statute and regulations, A.R. 073, 077, 080, 110; introduces the priorities as operating "[i]n addition to" them, A.R. 080; recites the regulations section by section, A.R. 078–79; and conditions alignment on legal authorization at every step, A.R. 077, 080, 111. An instrument that repeals regulations does not present itself as an addition to them. *Cf. Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002); *DSCC*, slip op. at 7.

Plaintiff's answer will be that an agency cannot cure an unlawful command by appending a qualification. The answer assumes the command. Defendants do not rely on the qualifications to save a directive that would otherwise conflict with the regulations; they rely on the absence of any directive. The qualifications matter because they confirm the reading the operative verbs already compel, and because they foreclose the assumption on which Plaintiff's predictions depend—that the agency will apply a priority in a manner the announcement forbids.

Nor does the statute confine the Secretary to the regulations' floor. Section 300(b) directs that "[i]n making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally,

the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." That list fixes what the Secretary must weigh; it does not make the list exclusive. Adding lawful considerations to the statutory and regulatory ones is the ordinary exercise of the discretion Congress conferred, *Planned Parenthood of Wis.*, 316 F. Supp. 3d at 309–10, and a directive addressed to agency officials about how to exercise that discretion "to the extent authorized by law" commands no private party.

Each alleged facial conflict fails.

**"Biological Reality."** Plaintiff reads the "[p]romoting evidence-based care" priority as one that "targets transgender patients" and mandates "the denial of gender identity." Compl. ¶ 107; *see id.* ¶¶ 110–19. The priority states that "HHS will prioritize funding for grantees who maintain a science-driven approach to healthcare, including by protecting children, respecting biological reality, and upholding scientific integrity," and identifies as a key strategy "providing developmentally appropriate counseling rooted in biological science." A.R. 083. The OASH priority Plaintiff pairs with it—ensuring "programs accurately reflect science"—operates "to the extent permitted by applicable law," A.R. 135, and the HHS priority addresses "gender ideology," a set of propositions, directing nothing about service delivery, A.R. 144. The regulations Plaintiff invokes govern nondiscriminatory service delivery, 42 C.F.R. §§ 59.5(a)(3)–(4), 59.2; none prescribes any practice of address or vocabulary. The only Title X document that does is the 2024 Quality Family Planning guidance, Compl. ¶ 114, which is sub-regulatory.[4] A NOFO cannot conflict with regulations by departing from a recommendation the regulations nowhere contain.

---

[4] The 2021 Rule that codified many of the regulations at issue pre-dates the 2024 QFP. *See* 86 Fed. Reg. 56,144 (Oct. 7, 2021).

**"Marriage and Parenthood Counseling."** Plaintiff reads the "[a]dvancing reproductive goals counseling" priority as a mandate to counsel patients toward marriage and parenthood in derogation of nondirective counseling. Compl. ¶¶ 87–91. The priority's operative verbs are "offer," "affirm," and "support": grantees are expected to "*offer* reproductive goals counseling that presents evidence-informed pathways associated with improved economic stability and family stability"; such counseling "should *affirm* marriage and parenthood as meaningful and valued components of adult life . . . and support informed decision-making"; and clinics "are expected to provide services that *support* individuals and families seeking to have children." A.R. 082–083 (emphasis added). The priority directs no counselor to recommend marriage, parenthood, pregnancy, or any other course to any patient. It speaks of offering information and supporting informed decision-making, and it leaves the nondirective-counseling regulation in force. 42 C.F.R. § 59.5(a)(5); *see id.* §§ 59.5(a)(2), 59.2. Whether a particular counseling practice would comply with § 59.5(a)(5) is a question about an actual project, not this document.

**"Anti-Contraception."** Plaintiff reads the "[r]educing overmedicalization" and "[p]romoting body and health literacy" priorities as requiring applicants "to prioritize certain types of family planning over others" in derogation of § 59.5(a)(1)'s "broad range" requirement and § 59.5(a)(2)'s bar on coercion. Compl. ¶¶ 74–79. The overmedicalization priority asks applicants to show "how their Title X projects will integrate noninvasive, evidence-based practices," and lists key strategies that "include, but are not limited to, expanding access to fertility-awareness-based methods" and "providing education and counseling that encourage lifestyle practices supporting reproductive health." A.R. 081–082. Its only reference to contraception is survey data on use and on the reasons women report for discontinuing. A.R. 081; Compl. ¶ 74. Nowhere does the NOFO tell an applicant to offer fewer methods, favor one over another, or discourage any. The body-

literacy priority requires clinics to “incorporate foundational body and health literacy into reproductive health counseling”—“education on menstrual cycle physiology, hormonal health, male and female fertility awareness, and early indicators of reproductive disorders.” A.R. 082; Compl. ¶ 75. Adding information to what a project already provides is not prioritizing a method. Both priorities are additive: “expanding access” to fertility-awareness methods expands access to a category § 59.5(a)(1) already requires projects to offer, and the NOFO separately requires every proposal to describe how it will provide the statutory broad range. A.R. 089.

**“Life-Affirming Program Delivery.”** Plaintiff reads “life-affirming” as a directive to depart from the regulations’ treatment of nondirective counseling and referral. Compl. ¶¶ 100–06. The priority is titled “[e]nforcing the Hyde Amendment,” and the phrase Plaintiff isolates sits beside “lawful, and ethical” in a sentence that begins “[t]o the extent permitted by applicable law”: “OASH will prioritize programs and funding that uphold Hyde protections and do not use taxpayer resources to promote or support elective abortion.” A.R. 083–84. Plaintiff’s own pleading identifies § 59.5(a)(5) and the appropriations rider requiring that pregnancy counseling be nondirective. Compl. ¶ 104 (citing Consolidated Appropriations Act, 2026, Pub. L. No. 119-75, 140 Stat. 173, 262). The NOFO overrides neither and incorporates both: it requires compliance with “the Title X statute, legislative mandates, and regulations,” A.R. 073, 078, and recites § 59.5 by section, A.R. 079. A priority reaffirming a mandate Congress has attached to this program for decades, A.R. 096–97, 129–33, and operating only within applicable law cannot be read to repeal it.

**Unspecified HHS and OASH priorities**. Plaintiff’s complaint that the NOFO references HHS and OASH priorities unrelated to family planning, Compl. ¶¶ 120–45, is answered by the in-scope qualifier: alignment with those priorities is confined to what is “authorized by law and within

the scope of the program," A.R. 111. A priority outside the scope of Title X cannot, by the NOFO's own terms, be applied within it.

Three conclusions follow. First, each challenged priority admits plausible lawful courses of compliance, so no facial conflict claim survives. Second, the Court need not resolve which facial-challenge standard governs: Plaintiff pleads that compliance with both is impossible, and that fails if a lawful course exists. *See Bondi*, 604 U.S. at 467–68. Third, the derivative claims fall with the premise.

### B. Announcing Priorities in a Competitive Funding Notice Is Not Rulemaking (Count Four).

Count Four is derivative on its face. Plaintiff pleads that the priorities "constitute a reversal or amendment of the Title X regulations . . . with which those priorities conflict." Compl. ¶ 201. Notice and comment is required to amend a legislative rule, *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015), not to state emphasis within one. A document that recites the regulations section by section and confines itself to what they permit amends nothing.

The NOFO would not require rulemaking in any event, because it is a general statement of policy. 5 U.S.C. § 553(b)(A). The question is whether the pronouncement carries "the force of law," *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993), and this one does not. It imposes no obligation on anyone, and it cannot disqualify an application for failing to align. A.R. 076. Evaluation criteria "do[] not [themselves] alter the rights or interests of parties, although [they] may alter the manner in which the parties present themselves or their viewpoints to the agency." *Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280–81 (D.C. Cir. 2000) (quoting *JEM Broad. Co. v. FCC*, 22 F.3d 320, 326 (D.C. Cir. 1994)); *accord Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 354–58 (D.C. Cir. 2017).

The only court to address the question for a Title X funding announcement held the same. *Planned Parenthood of Wis.*, 316 F. Supp. 3d at 304–08. Title X announcements have stated priorities without notice and comment in every administration for decades, *id.* at 297, and the regulations contemplate that the Secretary will announce considerations governing each competition. 42 C.F.R. § 59.7(a). Plaintiff's rule would require rulemaking before every federal grant competition.

### C. A Criterion That Yields to Law and Disqualifies No One Is Neither Arbitrary Nor Unfair (Count Three).

Review under § 706(2)(A) is deferential. It asks whether the decision falls within "a zone of reasonableness" and forbids a court to "substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The second and third features satisfy it.

The action under review is modest, and the explanation is measured against it. The NOFO amends no regulation, alters no project requirement, and leaves § 59.7(a)'s criteria in place; it states what the agency will emphasize in choosing among competing proposals and allocates points to that emphasis in the same proportion the program used in 2018. A.R. 109–11. For an action of that character, the agency has explained itself: each OPA priority states a rationale, enumerated "key strategies," and supporting record material, A.R. 080–84, 081 nn.1–2, 082 n.3; each is subordinated to the statute and regulations, A.R. 073, 078, 080; and the OASH and HHS priorities are incorporated only "to the extent permitted by applicable law" and "within the scope of the program," A.R. 111, 135–36. The key strategies are specific, not abstract: the overmedicalization priority identifies expanding access to fertility-awareness-based methods and providing education and counseling that support reproductive health, A.R. 081–82; the body-literacy priority identifies

the content to be added to counseling—menstrual cycle physiology, hormonal health, fertility awareness, and early indicators of reproductive disorders, A.R. 082; and the reproductive-goals priority identifies the counseling to be offered, A.R. 082–83. Plaintiff identifies no statutory or regulatory factor the Secretary failed to consider. Its objection is to the weight assigned to competing lawful considerations—a judgment the APA leaves to the agency.

That the emphasis is new is not a defect. An agency may change emphasis if it acknowledges the change and gives reasons, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009), and this NOFO announces its priorities as priorities and scores them on the same 100-point allocation the program used in 2018. A.R. 109–10. Nor could anyone rely on a competition's criteria remaining fixed in a program whose announcements have stated new priorities in every administration. *See* Compl. ¶ 196. What grantees can reasonably rely on—i.e., the regulations, the review process, and the project period—is unchanged.

Plaintiff's remaining theory is that the NOFO "does not specify what actions are sufficient to constitute 'alignment.'" Compl. ¶¶ 85, 98, 102, 118; *see id.* ¶¶ 159–61. Fair notice is a shield against enforcement, not a right to advance clarity. The "ascertainable certainty" standard measures what an agency may enforce against a party who guessed wrong. *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995). Here, nothing is enforced against anyone, and no application is disqualified or sanctioned for misjudging how reviewers will weigh a criterion. A.R. 076. As the Supreme Court has said of competitive grant criteria, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe," and a theory that condemned evaluative selection criteria would jeopardize "all Government programs awarding scholarships and grants on the basis of subjective criteria such as 'excellence.'" *NEA v. Finley*, 524 U.S. at 589; *see id.* at 590 (facial vagueness challenge rejected).

Plaintiff may invoke decisions holding agency actions premised on undefined terms arbitrary or unconstitutionally vague. These cases involve certifications demanded of a current grantee on pain of termination or False Claims Act liability, where the undefined term fixed what conduct was punishable. In contrast, an undefined term in a criterion a reviewer may weigh is the ordinary imprecision of merit review: "the extent to which," "the degree to which," under which every Title X applicant has competed for decades. A.R. 109–10. And the NOFO premises no funding decision on an undefined concept in any event. Each priority carries enumerated strategies, A.R. 081–84; § 59.7(a)'s health-equity criterion applies "according to the criteria set forth in Title X regulations," A.R. 111, where § 59.2 defines the term; and the balance is confined to what is "authorized by law and within the scope of the program," A.R. 111.

Plaintiff's members do not say they cannot understand the criteria. They say they disagree with them. Indeed, their conflict claims assert that they know precisely what alignment demands. A rubric does not fail for vagueness because applicants cannot score their own papers in advance.

## IV. THE SPENDING CLAUSE CLAIM IS INSUBSTANTIAL AND DOES NOT STATE A CLAIM (COUNT FIVE)

Count Five alleges that the NOFO violates the Spending Clause because it fails to give members "fair and advance notice" of funding conditions they must "knowingly and voluntarily" accept. Compl. ¶¶ 204–08 (citing *South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17, 25 (1981); and *Landor v. La. Dep't of Corr. & Pub. Safety*, 146 S. Ct. 1931, 1941 (2026)).

The claim misunderstands the doctrine it invokes in three respects, any one of which disposes of it.

*First*, the clear-notice rule protects a recipient at *acceptance*. Because "legislation enacted pursuant to the spending power is much in the nature of a contract," its legitimacy "rests on whether

the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst*, 451 U.S. at 17; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The *Landor* decision Plaintiff cites says so: the doctrine ensures conditions "apply only to those who have knowingly and voluntarily agreed to them," and parties who never entered a funding agreement are bound by nothing under it. *Landor*, 146 S. Ct. at 1941. No member has applied, been offered, or accepted anything. The constitutional count is therefore premature for the same basic reason as the statutory claims: no member has yet accepted a funding condition whose clarity could matter under the Spending Clause.

*Second*, the rule polices *conditions*. *Landor*, 146 S. Ct. at 1940 (quoting *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 365–66 (2025)). Scoring priorities are not conditions. An applicant that ignores a priority loses points in a competition, not awarded funds, and the Supreme Court has rejected the theory that evaluative grant criteria must meet a heightened standard of precision. *Finley*, 524 U.S. at 589–90.

*Third*, whatever the doctrine's outer limits, Defendants are not aware of and Plaintiff has not identified any decision applying *Pennhurst*'s clear-notice rule to an agency's pre-award scoring criteria in a competitive grant process. The closest analogues are cases holding that an agency exceeded *statutory* authority by imposing conditions on already-awarded funds, *e.g.*, *City of Philadelphia v. Att'y Gen.*, 916 F.3d 276 (3d Cir. 2019)—an APA theory Plaintiff already pleads in Counts One and Two. The decisions extending the contract analogy beyond the States run in one direction: as a limit on the liability a condition may impose on parties that accept funds, not as a source of rights for parties that have not. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596

U.S. 212, 219–20 (2022); *Landor*, 146 S. Ct. at 1940. And Plaintiff cites nothing for its assertion that "[t]he above requirements apply to federal Executive Branch agencies." Compl. ¶ 206.[5]

A constitutional count that duplicates a statutory one, aimed at a document that awards nothing, conditions nothing, and has been applied to no one, fails.

## V. ANY RELIEF SHOULD BE NO BROADER THAN NECESSARY

If the Court reaches relief, it should tailor any remedy to Plaintiff's established injury. Plaintiff seeks vacatur of the priorities' incorporation in the NOFO, an injunction against their implementation at any stage of application or grant administration, and postponement under 5 U.S.C. § 705. Compl. ¶¶ 211–13. Those requests do not establish that each form or the full scope of relief is necessary.

Equitable relief must be no broader than necessary to redress the plaintiff's own injury. *Trump v. CASA, Inc.*, 606 U.S. 831, 855 (2025). Defendants preserve for further review their position that § 706 does not authorize universal vacatur, while acknowledging this Circuit's contrary precedent. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998). Whatever the permissible reach of vacatur, a defect in one challenged provision

[5] *Dole* states the clear-notice condition in terms of Congress and the States: "[i]f *Congress* desires to condition the *States'* receipt of federal funds, it 'must do so unambiguously . . . , enabl[ing] the *States* to exercise their choice knowingly, cognizant of the consequences of their participation.'" 483 U.S. at 207 (emphasis added) (quoting *Pennhurst*, 451 U.S. at 17). The D.C. Circuit has applied the *Dole* framework to an agency rule imposed on public housing authorities that had already accepted federal funds. *NYC C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757, 765–67 (D.C. Cir. 2022). But in restating *Dole*'s second condition the court omitted its subject and its object, "Congress" and "the States." And it had no occasion to decide whether the rule reaches an agency's selection criteria or a private competitor, because it resolved the challenge on the ground that the recipients' own contracts "clearly set forth the consequences" of noncompliance. *Id.* at 766–67. Were the framework to apply, the NOFO would satisfy it: it states every priority, its weight (35 of 100 points), the statutory and regulatory requirements it supplements, and the limit of applicable law. A.R. 080–84, 109–11. That is sufficient notice, *Barbour v. WMATA*, 374 F.3d 1161, 1167–70 (D.C. Cir. 2004), and the ordinary bargain of a Title X grant, which the government may award on program-defining terms of its choosing, *Rust v. Sullivan*, 500 U.S. 173, 193 (1991).

would not itself justify setting aside the entire NOFO. Should the Court find any provision unlawful, Defendants request an opportunity to address severability and the appropriate scope of relief before judgment issues.

## VI. CONCLUSION

The Court should dismiss the Complaint without prejudice as unripe. In the alternative, it should dismiss Counts Four and Five for failure to state a claim and enter summary judgment for Defendants on the remaining counts. Should the Court rule for Plaintiff in any way, relief should be no broader than necessary to redress Plaintiff's established injury, and Defendants request an opportunity to be heard on remedy.

September 14, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

*/s/ Landen P. Benson*

MATTHEW C. ZORN
Senior Counsel to the
Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
matthew.zorn2@usdoj.gov

LANDEN P. BENSON
Special Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
landen.benson@hhs.gov

*Counsel for Defendants*