**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.,

Plaintiff,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants.

Civil Action No. 1:26-cv-02656 (CRC)

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT, AND OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........ 1
ARGUMENT ........ 3
I. THERE IS NO ARTICLE III CASE OR CONTROVERSY. ........ 3
A. PPFA has not shown that the challenged criteria place any member on worse competitive terms. ........ 4
B. Independently, PPFA has not identified a member ready to compete if the challenged criteria were removed. ........ 9
C. The cases mark the rule's contours, and PPFA falls outside them. ........ 10
D. PPFA's case rests on characterizations the document contradicts. ........ 12
E. PPFA's remaining answers. ........ 16
F. Counts Four and Five are no different. ........ 17
II. THE RESULT IS THE SAME UNDER THE PRUDENTIAL INQUIRY. ........ 17
A. Fitness. ........ 17
B. Hardship. ........ 18
III. THE CLAIMS FAIL ON THE MERITS ........ 19
A. The priorities can be advanced consistently with Part 59. ........ 19
B. The criteria do not conflict with the regulations (Count One) or exceed the Secretary's authority (Count Two). ........ 20
C. The criteria are not arbitrary and capricious (Count Three). ........ 25
D. The notice-and-comment claim fails (Count Four). ........ 31
E. The Spending Clause claim fails (Count Five). ........ 31
IV. ANY RELIEF MUST BE LIMITED TO PLAINTIFF'S MEMBERS. ........ 33
CONCLUSION ........ 34

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Aetna Life Ins. Co. v. Haworth*,
300 U.S. 227 (1937) ..... 3

*Allied-Signal, Inc. v. NRC*,
988 F.2d 146 (D.C. Cir. 1993) ..... 33, 34

*Am. Mining Cong. v. MSHA*,
995 F.2d 1106 (D.C. Cir. 1993) ..... 31

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ..... 31

*Ass'n of Data Processing Serv. Orgs. v. Camp*,
397 U.S. 150 (1970) ..... 12

*Barnes v. Gorman*,
536 U.S. 181 (2002) ..... 32

*Bennett v. Ky. Dep't of Educ.*,
470 U.S. 656 (1985) ..... 27, 32

*Bldg. & Constr. Trades Dep't v. Allbaugh*,
295 F.3d 28 (D.C. Cir. 2002) ..... 17

*California v. U.S. Dep't of Transp.*,
808 F. Supp. 3d 291 (D.R.I. 2025) ..... 12

*City & Cnty. of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ..... 21

*City of Houston v. HUD*,
24 F.3d 1421 (D.C. Cir. 1994) ..... 16

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ..... 6, 18

*Covad Commc'ns Co. v. Bell Atl. Corp.*,
407 F.3d 1220 (D.C. Cir. 2005) ..... 7

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ..... 32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ..... 30

*Encino Motorcars, LLC v. Navarro*,
579 U.S. 211 (2016) ..... 27, 30

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ..... 28, 29

*Freedom Network v. Trump*,
830 F. Supp. 3d 681 (N.D. Ill. 2026) ..... 12, 32

*Gill v. Whitford*,
585 U.S. 48 (2018) ..... 9, 10, 33

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ..... 33

*Hennepin Cnty. v. HHS*,
No. 1:26-cv-02460-CRC, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ..... Passim

*HIAS, Inc. v. Trump*,
985 F.3d 309 (4th Cir. 2021) .......... 21
*Hurson Assocs., Inc. v. Glickman*,
229 F.3d 277 (D.C. Cir. 2000) .......... 31
*Jerome Stevens Pharm., Inc. v. FDA*,
402 F.3d 1249 (D.C. Cir. 2005) .......... 7
*League of United Latin Am. Citizens v. Exec. Office of the President*,
780 F. Supp. 3d 148 (D.D.C. 2025) .......... 21
*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .......... 1, 10, 17
*Mendoza v. Perez*,
754 F.3d 1002 (D.C. Cir. 2014) .......... 31
*Missouri v. Yellen,*
*539 F. Supp. 3d 802 (E.D. Mo. 2021) .......... 32*
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......... 29, 30
*N.Y.C. C.L.A.S.H. v. Fudge*,
47 F.4th 757 (D.C. Cir. 2022) .......... 32
*Nat'l Endowment for the Arts v. Finley*,
524 U.S. 569 (1998) .......... 26
*Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*,
468 F.3d 826 (D.C. Cir. 2006) .......... 18
*Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*,
No. 1:26-cv-01684, 2026 WL 2790025 (M.D. Pa. Sept. 17, 2026) .......... 2, 11, 12
*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003) .......... 18
*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993) .......... Passim
*Nissan Chem. Corp. v. FDA*,
744 F. Supp. 3d 1 (D.D.C. 2024) .......... 26, 29
*Oceana, Inc. v. Ross*,
920 F.3d 855 (D.C. Cir. 2019) .......... 30
*Ohio Forestry Ass'n v. Sierra Club*,
523 U.S. 726 (1998) .......... 18, 19
*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 31, 32
*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .......... 22, 31
*Planned Parenthood of Greater N.Y. v. HHS*,
No. 25-cv-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025) .......... 27
*Planned Parenthood of Greater Wash. & N. Idaho v. HHS*,
946 F.3d 1100 (9th Cir. 2020) .......... 6, 7
*Planned Parenthood of Wis., Inc. v. Azar*
316 F. Supp. 3d 291 (D.D.C. 2018) .......... 14, 16
*Pub. Serv. Comm'n of Utah v. Wycoff Co.*,
344 U.S. 237 (1952) .......... 18

*Reno v. Catholic Soc. Servs., Inc.*,
509 U.S. 43 (1993) .......... Passim
*Sherley v. Sebelius*,
610 F.3d 69 (D.C. Cir. 2010) .......... Passim
*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 31
*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......... 10, 17
*Texas v. Yellen*,
105 F.4th 755 (5th Cir. 2024) .......... 32
*Toilet Goods Ass'n v. Gardner*,
387 U.S. 158 (1967) .......... 3
*Trump v. California*,
609 U.S. ___, 2026 WL 2473573 (U.S. Aug. 24, 2026) .......... 16
*Trump v. CASA, Inc.*,
606 U.S. 831 (2025) .......... 33
*U.S. House of Representatives v. U.S. Dep't of Commerce*,
11 F. Supp. 2d 76 (D.D.C. 1998) .......... 17

**<u>Statutes</u>**

5 U.S.C. § 705 .......... 16
5 U.S.C. § 706 .......... 15, 16
42 U.S.C. § 300(a) .......... 25
42 U.S.C. § 300(b) .......... 26
42 U.S.C. § 300a-4(b), and § 300(b) .......... 20, 29, 31

**<u>Rules</u>**

Fed. R. Evid. 201(b) .......... 7

**Regulations**

42 C.F.R. part 59 .......... Passim
42 C.F.R. § 59.7(a) .......... 20
42 C.F.R. §§ 59.2, 59.5(a)(3)–(4) .......... 21, 22
42 C.F.R §§ 59.5(a)(1) 5) .......... 22, 23, 24, 25

## INTRODUCTION

PPFA asks the Court to invalidate criteria used to score a grant competition before any application has been evaluated. A prospective applicant need not await a funding decision to challenge unequal terms of competition, but it must establish those unequal terms. PPFA has not connected any challenged criterion to an actual or imminent disadvantage to an identified member.

The NOFO distinguishes eligibility, evaluation, and performance. Alignment with the Department's priorities is not among the grounds for disqualification. At merit review, applicants receive up to 35 points for "the extent to which the applicant proposes strategies that meaningfully advance" those priorities. AR110. After award, recipients must align their projects "when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance." AR077. PPFA treats these provisions as a present exclusion from competition. The document establishes none.

Article III requires an actual or imminent competitive disadvantage attributable to the challenged action, not merely the possibility of an unfavorable decision under it. An applicant need not prove that it will lose funding, but it must show that it faces competition on worse terms. *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Sherley v. Sebelius*, 610 F.3d 69, 72–74 (D.C. Cir. 2010). And where the instrument does not establish that disadvantage, the plaintiff must supply the missing facts. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

PPFA's showing fails in two independent respects. First, even assuming a member ready to apply, neither the NOFO nor the declaration establishes how that member would compete on worse terms. The declaration identifies no intended project and connects no member to a particular burden. Second, although the declaration names current grantees, it does not identify which

member would apply if the challenged criteria were removed. Decl. ¶¶ 36, 78, 91. Either deficiency is sufficient.

The distinction from *Hennepin County* is concrete. There, this Court identified programs the plaintiffs operated and provisions that disqualified them, and found the plaintiffs independently injured by notices they could not comply with. *Hennepin Cnty. v. HHS*, No. 1:26-cv-02460-CRC, 2026 WL 2426300, at *10–11 (D.D.C. Aug. 19, 2026). Here, the missing connection between the criteria and a member's injury is why further development matters. *See Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 58–59 & n.19 (1993) ("*CSS*"). The only court to construe this NOFO in this posture held the challenge unripe. *Nat'l Family Planning & Reprod. Health Ass'n v. Kennedy*, No. 1:26-cv-01684, 2026 WL 2790025, at *2–4 (M.D. Pa. Sept. 17, 2026) ("*NFPRHA*").[1]

If the Court reaches the merits, it should reject PPFA's reading of the priorities. The NOFO preserves 42 C.F.R. part 59, subpart A's service requirements, and the challenged priorities can be advanced consistently with them. Expanding access to fertility-awareness methods does not require restricting other contraception. Counseling grounded in reproductive biology does not require disregarding client preferences. Reproductive-goals counseling does not displace nondirective pregnancy-options counseling. The NOFO also states its terms and its reasons, and PPFA's objections do not show otherwise.

The Court should dismiss without prejudice or, alternatively, grant summary judgment for Defendants, confine any relief to the injury established, and remand without vacatur for any curable deficiency in explanation.

---

[1] During briefing, the *NFPRHA* court ordered supplemental briefing on *CSS* and then canceled argument on the cross-motions to "first resolve Defendants' motion to dismiss." Mot. 3, 6; *NFPRHA*, ECF Nos. 62, 68. It then dismissed. *NFPRHA*, ECF No. 73. A third challenge, *New York v. HHS*, No. 1:26-cv-03405 (D. Md.), is pending; Defendants have moved to transfer it here. *New York v. HHS*, ECF No. 46.

## ARGUMENT

### I. THERE IS NO ARTICLE III CASE OR CONTROVERSY.

A case or controversy is one "admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937). Three questions determine whether a challenge to a funding criterion presents one before any application has been evaluated.

First, injury: what the plaintiff claims to have lost. An unequal opportunity to compete is itself an injury, distinct from the eventual loss of funding. *Ne. Fla.*, 508 U.S. at 666.

Second, connection: how the challenged action produces that injury for this plaintiff. *Northeastern Florida* required members able and ready to bid whom the challenged policy prevented from competing equally. *Id. Sherley* required an actual or imminent increase in competition for a fixed pool of funds. 610 F.3d at 72–74. Neither required proof of an unsuccessful bid, but both required showing how the challenged action altered the plaintiffs' competitive position.

Third, timing: whether that injury exists now or depends on unresolved future events. *CSS*, 509 U.S. at 58–59 & n.19. A challenge is premature when the agency's future application of a rule determines its effect on the plaintiff, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 163–64 (1967); it is not premature when unequal footing is already established and only the award remains uncertain. *Ne. Fla.*, 508 U.S. at 666; *Sherley*, 610 F.3d at 72–74; *cf. CSS*, 509 U.S. at 59 n.19.

The principal defect is the missing connection. PPFA invokes a recognized injury—unequal opportunity to compete—but has not shown how the challenged criteria inflict that injury on an identified member. If it had established unequal footing, uncertainty about the eventual award would not defeat review.

Parts I.A–F are the constitutional ground; Part II is the prudential alternative, and dismissal on the first does not depend on the second.

**A. PPFA has not shown that the challenged criteria place any member on worse competitive terms.**

Assume an identified member intends to apply. That establishes a prospective competitor, not a competitive injury. PPFA must still show that the challenged criteria place that member on worse terms. It need not prove that the member will lose funding. It must identify the disadvantage it asks the Court to remedy. *Ne. Fla.*, 508 U.S. at 666; *Sherley*, 610 F.3d at 72–74. Neither the NOFO nor the declaration establishes that disadvantage here.

Begin with the instrument. A set-aside injures on its face: the day it issues, a class of bidders has lost something, and a court can read the document and name them. *Ne. Fla.*, 508 U.S. at 666. Because PPFA challenges the criteria before any application has been made, the disadvantage must follow from the instrument itself, read with established facts about an identified member, without speculation about how reviewers will exercise the judgment the rubric leaves to them. A disadvantage that exists only if reviewers read a priority one way rather than another, or weigh it one way rather than another, is an injury in application—and no application has occurred.

Here, the rubric awards points for "the extent to which the applicant proposes strategies that meaningfully advance" the priorities, AR110, and the priorities ask applicants to add—fertility-awareness access, body-literacy counseling, reproductive-goals counseling, counseling grounded in biology—not to omit anything a Title X project must provide. Parts III.A–B, *infra*. The rubric prescribes no deduction, no per-priority weight, and no automatic zero. AR109–10. It states a maximum and leaves the rest to evaluation. The allocation of up to 35 points establishes the importance of the priorities in scoring, but it does not establish which applicant they disadvantage or how. That showing, if it is to be made, must come from facts. And that is true

whether the criterion is lawful or not: an unlawful scoring criterion is still a scoring criterion, and whether it places any member on worse terms is a question of proof.

PPFA says the NOFO "sets out application criteria that are harming PPFA members now." Opp. 14. How so? The instruments in the cases answer that question on their face: a set-aside, *Ne. Fla.*, 508 U.S. at 666; an eligibility bar, *Hennepin*, 2026 WL 2426300, at *10; *CSS*, 509 U.S. at 63; a notice that admits new competitors, *Sherley*, 610 F.3d at 72–74. A scoring criterion answers it only with a showing of whom it burdens and how. The rubric's weight does not supply the missing connection between a challenged priority and the activities an identified member intends to propose.

**The declaration.** The Clawson declaration does not connect the criteria to a disadvantage for any member. It describes no intended project—not a drafted application, which Article III does not require, but the activities a member would propose and against which the criteria would be applied. What it offers instead are predictions: that members "are forced to adapt to unlawful requirements in order to submit competitive applications," Opp. 25 (citing Decl. ¶¶ 84–85), and that other applicants "may be willing" to align more fully, Decl. ¶ 85.

The adaptations it identifies, *id.* ¶ 84, do not establish that burden, either. It says, for example, that members will not de-emphasize FDA-approved contraception. But the priority asks applicants to *expand* access to a method § 59.5(a)(1) already names, and nothing in it asks for less of any other. AR082. It says members will not decline abortion referrals, yet PPFA identifies no provision directing them to, and the NOFO preserves the governing regulations, AR077, including § 59.5(a)(5)(ii)'s counseling and referral requirements. It says members will not deny clients' gender identities, but the criterion asks for "counseling rooted in biological science," AR083, and § 59.5(a)(4)'s bar on differential treatment remains in force. It says members will not advocate

marriage and childbirth, but the sentence PPFA relies on asks counseling to "affirm marriage and parenthood as meaningful and valued components of adult life" and to "support informed decision-making," AR083. Whether a member's refusal to advocate and the NOFO's request to affirm describe the same counseling depends on what that member would propose, and the declaration does not say. A prediction that reviewers will apply priorities unfavorably is an estimate of how an evaluation will go, not a fact showing a present or imminent disadvantage to an identified member. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013).[2]

Nor does the declaration establish a present cost caused by the criteria. It states that an application takes "3-4 months to prepare," Decl. ¶ 41, but does not distinguish ordinary application preparation from additional work attributable to the challenged priorities.

PPFA answers with timing. Applications are due January 11, and awards are anticipated April 1. The scoring, it says, is certainly impending. But "certainly impending" describes injuries, not calendars. *Clapper*, 568 U.S. at 409.

A scoring criterion can create a disadvantage before evaluation. A criterion awarding points for experience operating rural clinics would disadvantage an identified provider that has none; the provider could establish that disadvantage from the criterion and a sentence about itself. The Ninth Circuit found exactly that kind of tilt in the 2018 Teen Pregnancy Prevention Program FOAs, which "required applicants to implement" a named curriculum tool and "allotted at least a quarter of a grant applicant's scoring rubric to the implementation" of it, where the plaintiff alleged that the requirement was statutorily impermissible. *Planned Parenthood of Greater Wash. & N. Idaho*

[2] The Clawson declaration also recounts a news report that the Administration intended "realigning the Title X program." Decl. ¶ 40. The action under review is the NOFO, and the Court reviews the NOFO's text. The NOFO invites every eligible applicant, lists no applicant among the grounds for disqualification, and scores proposals. Whether any member's proposal would score lower under its priorities is the question no one can yet answer.

*v. HHS*, 946 F.3d 1100, 1109–10 (9th Cir. 2020). A requirement to implement a specified thing, a fixed share of the score for implementing it, and an applicant that would not: the tilt was on the page, and the court could say that "the magnitude of the alleged tilt is irrelevant" because the tilt itself could be seen. *Id.* at 1109. Here, PPFA supplies no comparable connection between a challenged criterion and an identified member.

**The *Hennepin* contrast.** PPFA offers *Hennepin County* as a "similar fact pattern." Opp. 12. In *Hennepin*, the Court found standing based on several declarations.[3] PPFA has filed one. Set beside each other, they show what this NOFO does not say and how early PPFA has come to court.

* * *

[3] *Hennepin County v. HHS*, No. 1:26-cv-02460-CRC, ECF Nos. 14-2 (Johnson Decl.), 14-3 (Gerber Decl.), 14-4 (Miller Decl.), 14-5 (Simon Decl.) (D.D.C. filed July 15, 2026). On a Rule 12(b)(1) motion the Court may consider materials outside the pleadings, *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005), and may take judicial notice of filings on its own docket for the fact of their contents, Fed. R. Evid. 201(b); *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005). Defendants cite the *Hennepin* declarations for what that record contains, not for truth.

| | ***Hennepin* (Johnson, Gerber, and Miller Decls.)** | **This case (Clawson Decl.)** |
|---|---|---|
| Identified proposed activities | Better Together Hennepin, using FLASH and Positive Prevention Plus at 12 high schools, 11 clinics, and a juvenile detention center. Johnson ¶¶ 6, 13, 15. Stepping Stones, at named sites in San Diego and West Virginia. Gerber ¶¶ 13, 17. The PPH TPP Project, using Safer Choices and Draw the Line, in five counties and two tribes. Miller ¶¶ 10, 14. | "Some of PPFA's member affiliates would like to apply." Clawson ¶ 78. No prospective applicant identified, and no project described. |
| Provision alleged to disadvantage those activities | "[R]equires incorporation of 'sexual risk avoidance' education." Gerber ¶ 45; Miller ¶ 22. Participants "shall not 'restrict participation in the project on the basis of . . . sex.'" Gerber ¶ 47. "[I]ncorporates agency priorities that prohibit normalizing teenage sexual activity." Johnson ¶ 31. | "The NOFO appears to require, or at a minimum appears to favor." Clawson ¶ 59. "[A]ppears to be pushing Title X projects away from contraception." *Id.* ¶ 53. "HHS appears to be suggesting." *Id.* ¶ 60. |
| Evidence connecting the two | "[I]t is not possible to comply with the statute's replication requirement and the new policy priorities in the NOFO." Johnson ¶ 33. "[I]t appears that the program would be impermissible under the new NOFO." Gerber ¶ 47. Termination letters naming the curricula. Johnson ¶¶ 26–28 & Ex. 2; Gerber ¶¶ 30–34 & Ex. 2; Miller ¶ 23 & Ex. 2. | "[I]t is unclear how they could prepare a competitive application." Clawson ¶ 50. "I do not know how an applicant could propose a competitive application." *Id.* ¶ 70. "I am worried, however, that the agency is taking a different view." *Id.* ¶ 71. "[N]or can I determine, which of these priorities … will be required." *Id.* ¶ 75. |

PPFA may say the *Hennepin* declarants also hedged on whether they would apply again, Johnson Decl. ¶ 38; Miller Decl. ¶¶ 37, 39, 41, and that the Court found standing anyway. The reason the Court gave is the distinction. The plaintiffs were "independently injured by the issuance of the forward-looking FY 2026 NOFOs" because "they cannot operate those initiatives while complying with the 2026 Policy," so that applying would be "a futile act." *Hennepin*, 2026 WL 2426300, at *10–11. For that finding it cited the paragraphs of the declarations that identified the programs and the requirements they could not meet. *Id.* Futility excused the application because

the record showed futility: concrete programs, set against particular restrictions the notices imposed. The TPP notices "require[d]," while this NOFO scores "the extent to which" a proposal "advance[s]." AR110. *Hennepin*'s 2026 notices and *PPGWNI*'s 2018 FOAs both told applicants what to implement and scored them on implementing it. This NOFO tells applicants what the agency values and scores the extent to which a proposal advances it.

A preference can disadvantage an applicant too, but the *Hennepin* record connected identified programs to identified restrictions. This record connects nothing to anyone. PPFA's declarant does not say any affiliate's project cannot comply. Rather, she says it is "unclear how" one would, Decl. ¶ 50, and the only things she says members will not do are things the NOFO does not ask. *Id.* ¶ 84. Futility was the *Hennepin* plaintiffs' route to injury without an application. PPFA has neither that route nor an identified applicant and a disadvantage, shown from the instrument or the record, that the criteria would work on it.

The breadth of the requested remedy further reflects that gap. PPFA asks the Court to bar consideration of every challenged priority "at any stage," Opp. 44, without identifying which priority places an identified member at a competitive disadvantage, or how. In *Hennepin*, removing the requirements that excluded identified programs would remove the obstacle; here, no corresponding connection between a criterion and a member's injury has been supplied. A remedy "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Asking the Court to remove every priority does not show what disadvantage removing any of them would redress.

### B. Independently, PPFA has not identified a member ready to compete if the challenged criteria were removed.

Even if the Court concludes that the challenged criteria could establish a competitive disadvantage before scoring, PPFA must identify a member that would face it. At summary

judgment, an association must establish injury to "at least one identified member." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); *see Lujan*, 504 U.S. at 561. "[S]tanding is not dispensed in gross." *Gill*, 585 U.S. at 73. The member must be identified, and so must the disadvantage the decree would redress for that member.

The declaration names seven affiliates that hold current grants, Decl. ¶ 36, but says only that "[s]ome of PPFA's member affiliates would like to apply" in this competition, ¶ 78, without identifying which. Its further statement that "it is hard to know if it is worthwhile for them to even submit an application," ¶ 91, does not supply the missing identification. Uncertainty caused by the challenged criteria would not itself defeat standing. The question is whether an identified member would compete if those criteria were removed. The declaration does not answer it.[4]

This deficiency is independent of whether the criteria disadvantage anyone. A history of participation supports an inference of continued interest, but PPFA must connect that interest to an identified member, and on this record it has not.

### C. The cases mark the rule's contours, and PPFA falls outside them.

In *CSS*, the Court distinguished *Northeastern Florida*—a set-aside where "the inability to compete on an equal footing" was complete when the ordinance issued, 508 U.S. 656, 666—from regulations that "limit[] access to a benefit" that is "not automatically bestowed," where the applicant must "take further affirmative steps" and the agency decides "on a case-by-case basis" whether each has qualified. 509 U.S. 43, 58–59. The Court reconciled the two in a footnote: the contractors' injury was "the inability to compete on an equal footing in the bidding process, not

[4] One of the seven affiliates PPFA names as a current direct grantee, Decl. ¶ 36, is Planned Parenthood North Central States. In *Hennepin*, represented by some of the same counsel who represent PPFA here, that organization submitted a declaration identifying its affiliate's TPP project, the two curricula it used, the counties and tribes it served, the termination letter it received, and the NOFO requirements it said it could not meet. *Hennepin*, Case No. 26-cv-2460, ECF No. 14-4 ¶¶ 10, 14, 23, 37–45. No declaration of that kind has been offered here.

the loss of a contract," while access to the *CSS* benefit was "conditioned on several nontrivial rules other than the two challenged," making denial "much more difficult to predict firmly." *Id.* at 58 n.19. PPFA says its members fit footnote 19: they "regularly" compete for Title X funds and seek "the inability to compete on an equal footing," not the grant itself. Opp. 20. But footnote 19 separates two questions: whether the plaintiff would apply, and whether the challenged rule would cause the injury alleged. Establishing the first does not establish the second. A history of competing may support an interest in competing again, but it says nothing about whether the field has been tilted. In *Northeastern Florida* the *ordinance* itself supplied the second: a share of contracts was reserved for others from the day it issued. Here, PPFA identifies nothing in the NOFO itself that places its members, as opposed to other applicants, on worse terms.

To the extent PPFA's theory is the denial it predicts, Opp. 13, 22, footnote 19 answers that too: a benefit "conditioned on several nontrivial rules other than the two challenged" is one whose denial cannot be "predict[ed] firmly." Because PPFA alleges competitive injury, the required showing concerns the terms of competition, and neither the instrument nor the record supplies it.

*Hennepin* is different for the reasons set out in Part I.A: identified programs faced incompatible requirements, prior terminations, and the notices stated that a nonaligned application "will not receive funding." 2026 WL 2426300, at *18. A scoring criterion, without a showing of whom it burdens and how, establishes no unequal footing.[5]

*NFPRHA* construed this NOFO and dismissed the challenge as unripe. 2026 WL 2790025, at *2–4. The court found no part of the competition closed to the plaintiffs and no concrete injury

[5] Competitor standing may not require a new entrant to the market or a formal disqualification, and a rule that required one might be "unduly restrictive." *Hennepin*, 2026 WL 2426300, at *10 n.6. Footnote 6 leaves in place the question it answered: whether *the instrument itself* presently disadvantages these applicants.

from uncertainty about preparing an application. *Id.* at *3. PPFA dismisses that decision as unpublished and governed by Third Circuit law, Opp. 17, but it addresses the same criteria and the same alleged harm.

The cases PPFA prefers over *NFPRHA* did not concern this document, and each involved an instrument that supplied a facial injury. *Freedom Network v. Trump*, 830 F. Supp. 3d 681, 698–700 (N.D. Ill. 2026), turned on an express exclusion and a conceded present choice: abandon proposed work or risk adverse treatment. *California v. U.S. Dep't of Transp.*, 808 F. Supp. 3d 291, 306 (D.R.I. 2025), involved a condition attached to funds already offered.

PPFA says that if *NFPRHA* were right, "the competitor standing doctrine would not exist." Opp. 17. Not so. Competitor standing recognizes injury and justiciability where the government's action itself alters the competition on its face: admits a competitor, *Sherley*, 610 F.3d at 72–74; opens a market, *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970); reserves a share, *Ne. Fla.*, 508 U.S. at 666. In every case, the plaintiff could show, from the instrument and facts about itself, that it competed on worse terms today than yesterday. *Sherley* did not require the plaintiffs to show they would lose funding to newly eligible competitors, 610 F.3d at 73–74, but it did require the government's action itself be shown to increase the competition they faced.

The boundary is thus not whether a new competitor enters or an existing one is formally barred—*see Hennepin*, 2026 WL 2426300, at *10 n.6—but whether the government's action, as opposed to a later action applying it, changes the plaintiff's competitive position. A scoring criterion has not been shown to do that here.

**D. PPFA's case rests on characterizations the document contradicts.**

**1. What the NOFO says.** The notice separates three stages. At the threshold, it lists grounds for disqualification: eligibility, responsiveness, format, timely submission. Alignment is not among them. AR106–09. At merit review, it awards up to 35 of 100 points for "[t]he extent to

which the applicant proposes strategies that meaningfully advance" the priorities; the other 65 go to other criteria. AR109–10. And after award, the NOFO requires a recipient to align the project it proposed and the agency approved, "when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance." AR077; AR113–14. Those obligations attach after award, to a project that exists: "grantees are held to their applications' terms," as PPFA's own declarant puts it. Decl. ¶ 43.

The corrective-action and termination provisions PPFA cites as proof that the priorities are mandatory, Opp. 10, 41; AR077, 114, are the ordinary remedies of every federal grant, and the obligation they enforce is that of the approved project. The provision must be read in full:

> Consistent with OASH's mission, in carrying out ***any project that is funded under this NOFO***, recipients must align program design and activities with agency priorities where consistent with program authority and the scope of the award (Priorities of the Office of the Assistant Secretary for Health," [sic] available online at: https://health.gov/priorities), and when authorized by law according to the Title X statute, regulations, legislative mandates, and additional program guidance. ***Funded activities*** must advance and support OASH's mission to improve the health and well-being of Americans.

AR077 (emphasis added); *see also* AR114. This does not require applicants to abandon existing service requirements or authorize HHS to penalize recipients for following them. Reading "must align" without the surrounding words converts a qualified obligation into the unrestricted command PPFA challenges.

**2. What PPFA calls it.** PPFA's brief reaches *Hennepin* by a sequence of substitutions. At AR110 the 35 points are a "consideration": "[t]he extent to which the applicant proposes strategies that meaningfully advance" the priorities. In PPFA's brief they become a "requirement," Opp. 10, then a "condition," Opp. 41, then a "funding gate," Opp. 17, and finally a present "exclusion" from competition, Opp. 12. The words change. The document does not.

PPFA says it "is not challenging the scoring of any particular grant application" and that its injury exists "regardless of the point values," because members "must ensure their applications comply." Opp. 14. Six pages later, alignment is "the most consequential aspect of the selection process." Opp. 19–20. Either way the injury must be located, in the document or in the record. If it is a command, what PPFA cites is AR073, which is a generic instruction to "ensure that their application complies with" the NOFO; AR080, which states "OPA *expects*"; and AR077, which is the post-award clause, qualified by "when authorized by law." No alignment gate exists. If the injury is the points, PPFA has supplied no facts establishing that they will disadvantage an identified member.

PPFA's prediction that nonalignment "will foreordain a grant denial," Opp. 13, is unsupported. A denial under this NOFO requires (1) a proposal, (2) a merit-review score on it, under a rubric that prescribes no deduction for omitting a priority, AR109–10, (3) scores on every competing proposal, (4) a federal-staff review that will "take into consideration" additional factors, AR111, and (5) a funding line below which proposals are not funded. The NOFO's "Federal Staff Review" section explains that OPA will coordinate with a senior appointee, who will consider "[a]lignment with HHS and OASH priorities, where authorized by law and within the scope of the program," among other factors, in recommending funding decisions to the Grants Management Officer. AR111. As in *Planned Parenthood of Wis., Inc. v. Azar*, "the scoring criteria does not legally bind the [decisionmaker's] final decision." 316 F. Supp. 3d 291, 302 (D.D.C. 2018), vacated as moot, 942 F.3d 512 (D.C. Cir. 2019) (another case involving Title X NOFOs). PPFA does not know any score, the field, or where the line will fall. *CSS* found a claim unripe where the benefit was "conditioned on several nontrivial rules other than the two challenged." 509 U.S. at 58

n.19. Here, the challenged criterion is one input to one of five stages, and PPFA's "foreordain[ed]" denial is a prediction about all five, stated as a fact about the first.

None of this asks PPFA to prove that its members would lose. *See* Part I.C, *supra*. The point is narrower: PPFA describes its injury as a foreordained denial, but the instrument foreordains none.

**3. The contingency PPFA's theory requires.** Alternatively, insofar as PPFA's injury depends on how HHS will apply the priorities rather than on what the rubric now says, PPFA must show the predicted application is imminent. It has not.

The relevant uncertainty is not whether a member will win funding but whether HHS will apply a challenged criterion in a particular manner said to injure that member. PPFA's theory requires three such applications, none of which has occurred: that reviewers will read a priority to require omitting a service a Title X project must provide, Opp. 24; Decl. ¶ 84, though the NOFO subordinates every priority to the regulations, AR077, AR111; that OPA will treat non-alignment as a deduction or exclusion, Opp. 13, 22, though the rubric prescribes neither, AR109–10; and that HHS will enforce "align" against a lawful, approved project through corrective action or termination, Opp. 10, 41, though the obligation attaches to the project the agency approved, "when authorized by law," AR077.

*CSS* distinguishes an established unequal opportunity to compete from an injury whose existence remains contingent on future agency action. 509 U.S. at 58–59 & n.19. Describing a possible adverse application does not bridge it. This ground goes to timing, not connection: it accepts PPFA's proposed connection and asks only whether the application that connection requires has been shown to be imminent.

**E. PPFA's remaining answers.**

**1. No administrative appeal.** PPFA says the NOFO "makes clear that there is no administrative appeal process." Opp. 15. There is a judicial one: an award decision is final agency action, AR112, reviewable under 5 U.S.C. § 706 by any applicant denied funding. The absence of an internal appeal makes the award decision the final one, not an unreviewable one. "The question is not whether judicial review will be available but rather whether judicial review is available now." *Planned Parenthood of Wis., Inc.*, 316 F. Supp. 3d at 307.

**2. Money potentially allocated to other parties.** PPFA says that "by that time, Title X grant money likely will be allocated to other parties." Opp. 15. That is a concern about the effectiveness of later review, not a present injury from the instrument. If the members' proposals are funded, no money has gone anywhere. If they are not, there is a decision, a record, and a reviewable agency action. That record will include the scores PPFA says it cannot see now, Opp. 15; nondisclosure to an applicant is not nondisclosure to a court. 5 U.S.C. § 706. The court could also, at that time, enter interim relief under 5 U.S.C. § 705 to preserve the status quo.

PPFA's one authority, *City of Houston v. HUD*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994), held a claim moot where the appropriation had lapsed and the funds had been obligated, and it noted that the plaintiff could have sought relief before that happened. That counsels a disappointed applicant to move promptly after an award decision; it is not a reason to review criteria before any decision exists. If the prospect of obligation made a solicitation reviewable the day it issued, every competitive grant would be reviewable on publication, because every competition ends with the money awarded to someone.

**3. The qualifier is the absence of a command, not a savings clause.** PPFA calls the lawful-scope qualifier "a generic disclaimer," "boilerplate," and says "'trust us' is not a defense to ripeness." Opp. 15. The Supreme Court has just said otherwise: Article III "prohibits federal courts

from stacking hypothetical on hypothetical to speculate that harm will eventually materialize." *Trump v. California*, 609 U.S. ___, 2026 WL 2473573, *2 (U.S. Aug. 24, 2026) (per curiam). A court does not presume that an agency will apply a criterion beyond the limit the instrument places on it. *See Bldg. & Constr. Trades Dep't v. Allbaugh*, 295 F.3d 28, 33, 36 (D.C. Cir. 2002). PPFA's answer—that the qualifier is too vague to know what it permits—is an argument that the dispute depends on a meaning the agency has not yet supplied—the very description of an unripe dispute.

**F. Counts Four and Five are no different.**

Procedural rights relax immediacy and redressability. *Lujan*, 504 U.S. at 572 n.7. Still, the procedure must protect a concrete interest threatened by the challenged action. *Summers*, 555 U.S. at 496–97.

The interest PPFA identifies for Count Four is its members' competitive position under criteria that, on this record, disadvantage no identified member. Count Five fails for the same reason: the clear-notice rule protects a recipient's choice whether to accept funds on stated terms, and no member has applied, been offered, or accepted anything. *See* Part III.E, *infra*.

## II. THE RESULT IS THE SAME UNDER THE PRUDENTIAL INQUIRY.

**A. Fitness.**

PPFA says that "[a] particular application [of the Challenged Criteria] will not help the court better grasp the relevant statutes." Opp. 14 (quoting *U.S. House of Representatives v. U.S. Dep't of Commerce*, 11 F. Supp. 2d 76, 94 (D.D.C. 1998)). There the statute answered the question on its face. Here the question—on PPFA's own telling—is what the priorities require, and PPFA's brief says, again and again, that it cannot tell. The NOFO "does not explain, from a practical standpoint," what one criterion requires, Opp. 7, and "nowhere identifies which priorities the agency considers to be authorized and within scope," Opp. 9–10. PPFA is left "having to guess." Opp. 15.

A dispute fit for decision has "taken on fixed and final shape so that a court can see what legal issues it is deciding, what effect its decision will have on the adversaries, and some useful purpose to be achieved in deciding them." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 244 (1952). Plaintiffs' words describe a dispute that is not. A particular application would tell the Court three things PPFA concedes it cannot identify now: what the priorities required of this applicant, whether that requirement was within Title X, and what relief would address it. Deciding those questions before the agency has applied its criteria to any proposal will "pre-empt and prejudice issues that are committed for initial decision to an administrative body." *Wycoff*, 344 U.S. at 246.

In addition, as of this filing, the November 9 webinar has not occurred and no FAQ has issued. AR068, 105. PPFA's declarant says that "[s]ome program officers" told affiliates "they cannot answer questions about the NOFO," Decl. ¶ 76, but does not say what was asked, by whom, or whether any affiliate used the process the NOFO prescribes, which exists precisely because individual program officers may not give applicants individualized guidance during a competition. AR105, 121. The D.C. Circuit addressed this posture in a case brought by the association that filed the first of these suits: told that funding conditions conflicted with the regulations, its answer was to "inquire of HHS exactly how the agency proposes to resolve any of the conflicts that it claims to spot." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006).

**B. Hardship.**

Hardship rests on the same predicted choice: replace programs now or suffer in evaluation. The declaration adds that an application takes "3-4 months to prepare" and that affiliates "must decide well in advance of the January 2027 deadline whether to apply." Decl. ¶¶ 41, 91. Preparing a responsive application is the ordinary cost of competing, and the declaration does not distinguish

that cost from any work attributable to the challenged priorities; a decision not yet made is not a hardship already suffered. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003); *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733–34 (1998); *Clapper*, 568 U.S. at 416. The "money gone" argument is answered above. Part I.E.2, *supra*. Hardship in fact runs the other way. Intervention in the middle of a live application window is the interference with an agency's process that *Ohio Forestry* counts against review, 523 U.S. at 733, 735, and a competition that cannot finish on its own timetable is the disruption Part IV describes. Part IV, *infra*.

## III. THE CLAIMS FAIL ON THE MERITS.

The Court should not reach the merits. If it does, PPFA concedes that the Secretary may consider criteria beyond those expressly listed in the statute. Opp. 26. The question is therefore whether these priorities conflict with the requirements governing Title X projects.

They do not. The NOFO preserves those requirements, and none of the cited priorities directs applicants to violate them or states that a project will receive credit for doing so. PPFA's contrary reading depends on additional premises: that expanding one contraceptive option requires restricting others, that counseling grounded in biology requires disregarding client preferences, and that discussing long-term reproductive goals displaces nondirective pregnancy-options counseling. The text supports none of those premises.

### A. The priorities can be advanced consistently with Part 59.

PPFA never describes a project that complies with a regulation and cannot comply with a criterion. Part III.B shows, criterion by criterion, why it cannot. Three example projects, each the ordinary shape of a Title X project, show what compliance with both looks like:

- A rural-access project (evening hours, a satellite clinic, transportation support) provides a "broad range" of methods § 59.5(a)(1) requires and advances the NOFO's access priorities.

- A project that serves every client without regard to sexual orientation, gender identity, or sex characteristics, and grounds its counseling in reproductive anatomy and pregnancy risk, satisfies §§ 59.2 and 59.5(a)(3)–(4) and the criterion PPFA calls "Biological Reality."
- A project that offers the full range of methods while expanding access to fertility-awareness-based methods, gives every pregnant client the nondirective options counseling § 59.5(a)(5) requires, and offers reproductive-goals counseling to clients who ask, satisfies the regulations and the two remaining criteria at once.

### B. The criteria do not conflict with the regulations (Count One) or exceed the Secretary's authority (Count Two).

**1. "Align" is not "prioritize."** PPFA says the distinction between an agency's priority and a grantee's obligation "collapses immediately" because the NOFO uses the word "align." Opp. 26. The verbs PPFA quotes prove the distinction. Recipients "must align program design and activities with agency priorities"—the sentence continues—"when authorized by law." AR077. PPFA omits the clause again. Next, proposals "should … [d]escribe plans and strategies for providing family planning services that *address* OPA program priorities." AR089, 091. Addressing a priority means describing how a project's strategies advance it, not adopting the agency's priority as the project's ordering of services. "Align" is not "prioritize," and the difference is not a strawman. It is the difference between what the agency looks for and what a project must do.

PPFA concedes the point that matters: "PPFA does not argue that Defendants may not consider additional criteria, only that Defendants may not consider additional criteria that conflict with law." Opp. 26. That concession answers the categorical version of Count Two. The Secretary may attach "such conditions as [he] may determine to be appropriate," 42 U.S.C. § 300a-4(b), and § 300(b)'s four considerations are mandatory, not exclusive, as PPFA's own regulation confirms, 42 C.F.R. § 59.7(a). And it narrows Count One to the three facial conflicts addressed below, none of which PPFA has located in the text.

PPFA's answer to the qualifier is that "[t]he requirement to align cannot be 'authorized by law' where it *clearly* contradicts the law, so Defendants' suggestion cannot be taken seriously." Opp. 26 (emphasis added). Its savings-clause cases state the same: a qualifier is disregarded where the instrument "unambiguously command[s] … action that a saving[s] clause purports to negate." *League of United Latin Am. Citizens v. Exec. Office of the President*, 780 F. Supp. 3d 148, 176 (D.D.C. 2025); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239–40 (9th Cir. 2018) (order that "unambiguously commands action"). Yet PPFA's position, eleven pages earlier and throughout its brief, is that the instrument is "fatally vague." Opp. 15. By the standard of its own cases, the qualifier is effective. *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), does not change that: the "procedure" and "standards" PPFA says are missing, Opp. 26–27, are the regulations themselves. Whatever Part 59 requires, a project must do; whatever it forbids, a project may not do; and alignment operates in the gap in between. AR077, AR111.

**2. "Biological Reality."** PPFA's conflict argument has a premise, a conclusion, and no middle. The premise is that regulations require services that are "client centered," "inclusive," and nondiscriminatory as to "sexual orientation, gender identity [or] sex characteristics." 42 C.F.R. §§ 59.2, 59.5(a)(3)–(4). The conclusion is that the "Biological Reality" criterion conflicts with the regulations. Opp. 24.

PPFA does not say the NOFO directs a project to turn anyone away, to treat any client differently, or to withhold any Title X service from anyone. What PPFA actually asserts is that the criterion "is not … 'inclusive' of LGBTQ+ individuals who wish to receive care that aligns with their gender identity." Opp. 24. Two problems.

*First*, the regulations it invokes govern how projects treat clients, and the NOFO does not require treating any client otherwise. Part 59 requires that every person be able to "participate in

and benefit from" a project's services; that services be "client-centered," i.e., "respectful of, and responsive to, individual client preferences, needs, and values," § 59.2; and that no one be turned away or treated differently based on sexual orientation, gender identity, or sex characteristics, § 59.5(a)(4). Every funded project carries those obligations. AR077. PPFA quotes no sentence of the NOFO that directs otherwise. Respecting a client's identity and preferences does not require a project to disregard reproductive anatomy in counseling it provides.

*Second*, the regulation and the priority operate on different things. Sections 59.2 and 59.5(a)(3)–(4) govern whom a project serves and how it treats them. The criterion governs the scientific basis of its counseling—"counseling rooted in biological science." AR083. The same project satisfies both.

The gap is filled, if at all, by the QFP. PPFA reads "nationally recognized standards of care," § 59.5(a)(3), to incorporate the 2024 QFP's "gender-inclusive approach" and its guidance on gender identity and pronouns. Opp. 36. But the regulation requires services "consistent with" nationally recognized standards. PPFA's own words are that the QFP is "one such" standard that "provides guiding principles," Opp. 4, not that each of its recommendations is a regulatory command. PPFA calls the point that the QFP is sub-regulatory a distraction, Opp. 36 n.18, without answering the point. The law for purposes of § 706(2)(A) is the statute and Part 59; the QFP is guidance that OPA "recognizes" by policy notice, Decl. ¶ 31, and that the agency may revise without rulemaking, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). A departure from one of its recommendations is "not in accordance with law" only if the regulation makes that recommendation a requirement. PPFA identifies no QFP recommendation that § 59.5(a)(3) incorporates in that way and that the NOFO directs projects to abandon, and the 2021 regulations themselves say nothing about pronouns or gender-affirming care.

Nor is the language PPFA quotes for the conflict the Title X criterion. "Ending support for gender ideology" and sex "unchangeable and determined by objective biology" are from the OASH and HHS priority statements, AR135, 144, which the NOFO incorporates only "where authorized by law and within the scope of the program." AR111. PPFA's conflict is built from documents the NOFO conditions on the regulations, read as if the condition were not there.

**3. "Anti-Contraception."** There is no "Anti-Contraception Criterion." The phrase appears nowhere in the NOFO. It is PPFA's label for the "Reducing overmedicalization in health care" and "Promoting body and health literacy" priorities. AR081–082.

PPFA says these priorities "requir[e] grantees to disfavor contraception." Opp. 25. But it quotes no language that says so. That is because there is none. What it instead quotes is a direction to "integrate" practices that avoid "unnecessary medicalization or symptom suppression," a "key strateg[y]" of "expanding access to fertility-awareness-based methods," and a requirement to "incorporate foundational body and health literacy into reproductive health counseling." AR082. None of those sentences tells a project to offer less contraception, counsel against it, or make it harder to get. PPFA's strongest observation is that the NOFO "references prescription contraception only once." Opp. 7. That is a conflict built from what the document does not say.

The one method the priorities do name proves the opposite of PPFA's point. "Expanding access to fertility-awareness-based methods (often referred to as natural family planning)" is a method § 59.5(a)(1) names: the regulation requires "a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods)." A priority that asks applicants to expand access to a method the regulation names cannot conflict with it. And PPFA's declarant confirms that its members already "provide counseling on natural family planning methods" and "basic infertility services." Decl. ¶ 58.

Nor does expanding access to one method "disfavor" another. The regulation forbids "coercion … to employ or not to employ any particular method[]," § 59.5(a)(2). Expanding what a client can choose is the opposite of coercing choice. And a direction to avoid "unnecessary … symptom suppression," AR082, does not direct anyone to leave a symptom untreated or to withhold a method a client has chosen.

The priorities state what the Department looks for. AR110. They do not direct any project to rank methods, steer clients, or reallocate services. PPFA reads "the agency prioritizes X" as "the grantee must subordinate Y," and then finds a conflict between the sentence it wrote and the regulation.

**4. "Marriage & Parenthood Counseling."** The argument rests on a regulation that does not reach the counseling PPFA describes. Section 59.5(a)(5) requires that *pregnant* clients be offered "neutral, factual information and nondirective counseling" on three things: prenatal care and delivery; infant care, foster care, or adoption; and pregnancy termination. The NOFO language PPFA quotes is about "reproductive goals counseling": "evidence-informed pathways," "longterm reproductive goals," and how "life choices, reproductive health, and fertility intersect." AR083. It says nothing about what a project tells a pregnant client about delivery, adoption, or termination, and PPFA does not claim it does. A project that gives every pregnant client nondirective counseling on all three options complies with § 59.5(a)(5) whether it also offers reproductive-goals counseling or not.

The sentence PPFA relies on must be read as a whole. It says: "Program counseling should affirm marriage and parenthood as meaningful and valued components of adult life, particularly in counseling adolescents on longterm reproductive goals, and support informed decision-making by helping individuals understand how life choices, reproductive health, and fertility intersect to

shape long-term stability, health, and wellbeing." AR083. The verb is "affirm," and PPFA reads it as a direction to steer. Not so. Its object is how a subject is presented, and its stated purpose, in the same clause, is to "support informed decision-making." The sentence expresses a view of marriage and parenthood, but it directs no client toward a choice, overrides no client's preferences, and conditions no service on sharing the view. The client-centered requirement, § 59.5(a)(3), the bar on coercion, § 59.5(a)(2), and the nondirective-counseling requirement, § 59.5(a)(5), all remain in force, and the sentence disturbs none of them. PPFA calls the counseling "directive" and "judgment-laden," Opp. 25, but § 706(2)(A) asks whether the NOFO is contrary to a regulation, not whether PPFA finds its framing congenial. Title X counseling has never been value-free: Congress itself requires projects to "encourage family participation" in minors' decisions. 42 U.S.C. § 300(a).

The discrimination point fails for a simpler reason. Section 59.5(a)(4) forbids discriminating against *clients* based on marital status. The NOFO does not say married and unmarried clients receive different counseling, services, or treatment. Presenting "evidence-informed pathways" that include "marriage prior to childbearing," AR083, no more discriminates against the unmarried than against clients who did not finish school. And one of the three sentences PPFA quotes—"provide services that support individuals and families seeking to have children," AR083—restates the infertility services Title X requires. 42 U.S.C. § 300(a); 42 C.F.R. § 59.5(a)(1).

**C. The criteria are not arbitrary and capricious (Count Three).**

**1. Vagueness.** PPFA's vagueness argument asks evaluative criteria to supply the precision of an enforcement rule. *Finley* rejects that premise for discretionary grants: "[W]hen the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe," and a contrary rule would jeopardize "all Government programs awarding

scholarships and grants on the basis of subjective criteria such as 'excellence.'" *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). The NOFO asks reviewers to assess the extent to which proposed strategies advance stated priorities; it does not prescribe a penalty for violating an undefined prohibition. And the criteria provide more guidance than PPFA acknowledges: the NOFO defines "optimal health," identifies the subjects of body-literacy counseling, and supplies examples of strategies applicants may propose. AR081–083.

The doctrine PPFA invokes—"ascertainable certainty," *Nissan Chem. Corp. v. FDA*, 744 F. Supp. 3d 1, 9 (D.D.C. 2024)—is a due-process limit on penalizing a regulated party for violating a standard it could not have known. No applicant has been penalized for anything under this NOFO. An applicant that misjudges how reviewers will read "optimal health" or "body literacy" loses nothing it holds; it competes, and it is scored. A low score on a subjective criterion is the ordinary outcome of a competition, not a sanction.

PPFA also misdescribes the document. It says the NOFO "does not define" optimal health. Opp. 29. The NOFO defines it in the sentence that introduces it: "optimal health (defined as physical, mental, and social wellbeing)." AR081. The body-literacy priority PPFA calls unexplained lists its subject: "education on menstrual cycle physiology, hormonal health, [and] male and female fertility awareness," and recognition of early indicators of named conditions. AR082. A brief that says a defined term is undefined is not describing vagueness in the document.

PPFA offers three distinctions from *Finley*. First, that *Finley*'s priority "was a factor for evaluators to consider, not a condition with which applicants were required to align." Opp. 34. That describes this NOFO. Second, that *Finley* involved "no express weighting." *Id.* Thirty-five points does not make a factor a condition. Third, that "decency and respect" were "inherently vague" while the terms here are "definable; they are simply not defined." Opp. 35. That standard

has no limit. "Relative need of the applicant" and "capacity to make rapid and effective use" of funds—the statute's own criteria, 42 U.S.C. § 300(b)—are definable and undefined. So was the 20-point criterion in the FY 2022 competition for "the ability of the applicant to advance" that year's announced priority. If "definable but not defined" were the test, no notice of funding opportunity would survive it. And this NOFO supplies what *Finley* did not require: definitions, examples, and a means of asking before the deadline.

The decisions PPFA relies on found vagueness where recipients faced sanction for noncompliance with terms they could not construe: in *Planned Parenthood of Greater N.Y. v. HHS*, No. 25-cv-2453, 2025 WL 2840318, at *2 (D.D.C. Oct. 7, 2025), grantees who could not draw down approved funds without certifying compliance by a deadline; or in *Hennepin*, notices that "categorically disqualif[ied]" nonaligned applications alongside terminations, 2026 WL 2426300, at *11.

Fair notice matters where a party must act, now, under threat of loss, and cannot tell what act is required. Here no one must act and nothing is lost. The post-award obligation, AR077, runs to the project the recipient designed and the agency approved; a recipient has notice of what its project requires because it wrote the project, and it has the award's terms in hand before it accepts. *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 670 (1985).

**2. Change in position.** The NOFO changes funding priorities. An agency changing course must "display awareness that it is changing position" and "show that there are good reasons for the new policy." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016). So, the question is what changed and whether the agency explained it. PPFA identifies supposed departures from continuing service requirements, changes in program emphasis, and reliance on

prior policy. The first are not required by the NOFO; the second are explained in it; and the asserted reliance interests are addressed below.

*First*, departures that do not exist. Most of what PPFA calls a change in position is the conflict argument answered in Part III.B, *supra*, under another name, and no conflict has been shown. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), forbids an agency to "simply disregard rules that are still on the books." The NOFO does the opposite: it conditions every priority on the statute, regulations, and legislative mandates. AR077, 111.

The same is true of the QFP. Nothing in the NOFO rescinds, amends, or disclaims it, Opp. 4, and the "departures" PPFA identifies are silences: the QFP addresses pronouns, and the NOFO does not mention them; the QFP recommends method-neutral counseling, and the NOFO asks projects to expand access to a method the regulation already requires. PPFA has not identified a QFP recommendation that a project must abandon to compete under this NOFO. Without one, there is no departure to explain; what the NOFO does change, it explains.

*Second,* the changes in emphasis the agency announced and explained. The NOFO announces its priorities as this competition's and states a rationale for each. The overmedicalization priority rests on a stated premise: that side effects are the most common reason for dissatisfied discontinuation of a method, with a cited source. The strategies it lists—expanding access to fertility-awareness-based methods and avoiding "unnecessary medicalization or symptom suppression"—respond to that premise. AR081–082 & n.2. The body-literacy priority states what it means by the term and why: early recognition of named conditions. AR082. The reproductive-goals priority states the sequence it describes, the outcome it associates with it, and cites OPA's survey finding that clients' fertility intentions go undiscussed; counseling on long-term reproductive goals is the strategy that finding supports. AR082–083. That is what "display

awareness" and "good reasons" require of a NOFO: the agency said what it now prioritizes in place of the last cycle's priorities, and why.

*Third,* the record answers PPFA's specific objections. PPFA makes two record arguments against the stated rationales. It says the evidence the NOFO cites "does not support" the agency's statement about dissatisfaction with contraceptive side effects. Opp. 38–39. The NOFO's sentence is that "the most common reason women reported discontinuing use related to dissatisfaction was side effects," citing the 2023 National Health Statistics Report. AR081 & n.2. The report says that. Among women who discontinued the pill because of dissatisfaction, 64.1 percent cited side effects; among those who discontinued an IUD for that reason, 64.4 percent did. Daniels & Abma, *Contraceptive Methods Women Have Ever Used: United States, 2015–2019*, Nat'l Health Stat. Rep. No. 195, at 7 & tbl. 6 (2023). PPFA answers with a different finding—that 99.2 percent of sexually experienced women have ever used contraception, *id.* at 1—which the NOFO does not dispute and which does not contradict the sentence the agency wrote.

PPFA's second objection is that the reproductive-goals priority's statement that "[r]esearch demonstrates" lower risks of poverty among those who complete education and enter the workforce before marrying and having children cites no study. Opp. 38; AR083. An agency announcing the priorities of a discretionary grant competition is not required to footnote every premise. *State Farm* requires a rational connection between the facts found and the choice made, *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and an agency may rest a policy judgment on propositions for which "scant empirical evidence can be marshaled," *Fox*, 556 U.S. at 519. The premise is a judgment Congress left to the Secretary, 42 U.S.C. § 300a-4(b). PPFA does not say it is false and identifies no contrary finding in the record; its objection is that the sentence lacks a footnote.

**3. Reliance.** PPFA says the agency failed to consider "the reliance interests of grantees in fairly competing for funding on terms they can understand without compromising their missions or violating the governing legal framework." Opp. 40. That is the vagueness and conflict arguments restated.

The reliance *Regents* and *Encino* protect is reliance on a policy a party has arranged its affairs around, such as the DACA enrollment in *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30–33 (2020), or the decades-old exemption in *Encino*, 579 U.S. at 221–22. PPFA identifies two things. One, it says, is its members' "significant investments—in training, personnel, and facilities—to align with the program goals and conditions that have been in place for decades." Decl. ¶ 83. The declaration does not say which goals or conditions. But the ones that have been in place for decades—the statute's service requirements and Part 59's—remain in force under this NOFO. AR077. The training, staff, and facilities built to deliver those services serve a project that offers them under this NOFO as under the last. The other is the members' current awards, which run through March 2027, Decl. ¶¶ 38–39, and which the NOFO does not touch.

What remains is an interest in competing for the next award on the last cycle's terms, and *Regents* does not require an agency to weigh that preference before announcing new ones.

**4. The record.** PPFA says the administrative record "consists of only two emails with attachments." Opp. 37. The number of emails in the record is not the test. Arbitrary-and-capricious review asks whether the agency's stated reasons are rational, *State Farm*, 463 U.S. at 43, not whether the record is long. The reasons for the challenged criteria are in the NOFO itself, which states a rationale and "key strategies" for each priority, AR081–84, and in the transmittal directing their inclusion, AR149–51. What PPFA seems to want—the agency's internal deliberations—is not part of an administrative record. *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019).

### D. The notice-and-comment claim fails (Count Four).

The criteria are "legislative rules," it says, because they "adopt[] a new position inconsistent with existing regulations" and "impose substantive conditions" on applicants. Opp. 40–41. The first premise is the conflict argument restated, and it fails with it: the priorities adopt no position inconsistent with Part 59. Part III.B, *supra*. The second premise requires the functional inquiry that follows: what the provisions bind, whom, and with what consequence. The NOFO imposes no pre-award condition on applicants, Part I.D, *supra*, and the post-award obligation it does impose runs to the recipient's own approved project, "when authorized by law." AR077.

A legislative rule is one that has the "force and effect of law"—that binds the agency and the public of its own force. *Perez*, 575 U.S. at 96–97; *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014). The question is functional. *Am. Mining Cong. v. MSHA*, 995 F.2d 1106, 1109–12 (D.C. Cir. 1993). The merit-review provisions describe how the agency will assess proposed projects in this competition. AR109–12. They do not amend Part 59, which continues to govern every funded project; they do not bind the agency, which will "take into consideration" additional factors after merit review and retains judgment over every award, AR111–12; and they do not bind applicants, who may propose whatever lawful project they choose. The funded-performance provisions, AR077, are conditions attached to particular awards under the existing statutory framework, 42 U.S.C. § 300a-4(b), not an amendment to the rules governing all Title X providers. Neither is a legislative rule.

Defendants do not press the *Hurson* characterization PPFA's footnote objects to, Opp. 41 n.20; *see Hurson Assocs., Inc. v. Glickman*, 229 F.3d 277, 280–83 (D.C. Cir. 2000), and the argument above does not depend on it.

### E. The Spending Clause claim fails (Count Five).

The clear-notice rule has a subject and a moment. PPFA's brief obscures both.

*First*, every statement of the rule by the Supreme Court names the subject: "in return for federal funds, *the States* agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981); *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). "*States* cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). PPFA quotes that last sentence as "[f]unding recipients 'cannot knowingly accept conditions' that 'they are unable to ascertain.'" Opp. 43. The cases that have carried the contract analogy beyond States have done so to limit what a recipient can be made to pay, *see, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 186–87 (2002); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219–20 (2022), not to give an applicant a claim against the criteria by which a grant will be awarded. PPFA cites no case applying the rule to a private entity's challenge to selection criteria for a competition it has not entered; *N.Y.C. C.L.A.S.H. v. Fudge*, 47 F.4th 757, 765–67 (D.C. Cir. 2022), turned on the housing authorities' existing contracts.

*Second*, the rule exists so that recipients may "exercise their choice knowingly, cognizant of the consequences of their participation." Opp. 44 n.21 (quoting *Pennhurst*). The choice is whether to take the money on terms offered, and the terms must be clear before it is made. An applicant deciding whether to *apply* has been offered nothing. The moment is when a recipient has every term in hand. *Bennett*, 470 U.S. at 669–70. PPFA's cases confirm the point. *Missouri v. Yellen*, 539 F. Supp. 3d 802, 811–13 (E.D. Mo. 2021), and *Texas v. Yellen*, 105 F.4th 755, 771–72 (5th Cir. 2024), were brought by States, against a condition Congress attached to funds it had offered, at the moment of deciding whether to accept them. *Freedom Network* involved a certification demanded of existing grantees on pain of False Claims Act liability. 830 F. Supp. 3d

at 707–08. A State with an offer on the table, or a grantee with money in hand and a new condition on keeping it. This case has neither.

Even on PPFA's terms the claim fails, because the condition it identifies is ascertainable. The clause PPFA calls "untenably vague" is the post-award requirement that recipients align "when authorized by law." Opp. 42 (quoting AR077). It binds recipients to the project they designed and the agency approved, read against the regulations the NOFO incorporates and the award they accept. AR113–14. A recipient cannot be "unable to ascertain" a condition defined by its own approved project. The Spending Clause count is a vagueness argument with a constitutional label, attached to a condition no member has accepted, measured from a moment no member has reached.

## IV. ANY RELIEF MUST BE LIMITED TO PLAINTIFF'S MEMBERS.

PPFA says, "Defendants do not dispute that vacatur is an appropriate remedy." Opp. 44 (citing Mot. 33). The Motion disputed scope, not the existence of the remedy, and Defendants preserve that objection here. Mot. 33–34. Any relief must be no broader than necessary to remedy the injuries established by PPFA's members. *Trump v. CASA, Inc.*, 606 U.S. 831, 855 (2025).

PPFA's proposed injunction would prohibit consideration of the challenged priorities "at any stage," Opp. 44, in a national competition among applicants who are not before the Court and who have not asked for that relief. Whether § 706 authorizes relief running to non-parties is a distinct question, and Defendants preserve their position on it without reargument. Mot. 33–34.

Any relief must be tailored to the injury established by PPFA's members. *Gill*, 585 U.S. at 73; Parts I.A–B, *supra*. PPFA has identified no such injury on this record. If the Court concludes otherwise, Defendants request an opportunity to address the appropriate scope of relief.

If the Court finds any explanation deficient, the remedy should be remand without vacatur. Whether to vacate turns on "the seriousness of the order's deficiencies" and "the disruptive

consequences of an interim change that may itself be changed." *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 150–51 (D.C. Cir. 1993); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197–98 (D.C. Cir. 2009). If the Court rejects PPFA's substantive challenges but finds the agency's explanation inadequate, remand without vacatur would permit the agency to address that deficiency while preserving the competition. The explanatory objections PPFA raises—an uncited premise, an unacknowledged change in emphasis—concern reasons the record already states, AR081–083, so there is a substantial prospect that the agency could substantiate the same choice on remand, the circumstance in which *Allied-Signal* remands without vacating. The disruption is measured against the record's timetable: applications are due January 11 and awards are anticipated April 1. AR068, 071.

Vacating the priorities after applicants have drafted to them would require the agency to reissue the criteria and re-notice every applicant within that window. An injunction against "considering" the priorities "at any stage," Opp. 44, would do the same. Remand without vacatur leaves the competition and its timetable in place while the agency supplements its reasons.

Moreover, current awards, including those held by PPFA's seven direct-grantee members, expire in March 2027, Decl. ¶¶ 38–39. Criteria reissued after applicants have drafted to the current ones could not be evaluated on the current schedule. Put simply, the remedy PPFA seeks would put the program on hold and impact all prospective grantees.

## CONCLUSION

The Court should dismiss the Complaint without prejudice under Rule 12(b)(1). In the alternative, it should deny Plaintiff's cross-motion and grant summary judgment for Defendants. In all events, any relief should be limited to Plaintiff's members.

Dated: October 16, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

/s/ *Matthew C. Zorn*

MATTHEW C. ZORN
Senior Counsel to the Associate Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
matthew.zorn2@usdoj.gov

LANDEN P. BENSON
Special Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
landen.benson@hhs.gov

*Counsel for Defendants*