**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PLANNED PARENTHOOD FEDERATION OF AMERICA, INC.

*Plaintiff*,

v.

U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES et al.,

*Defendants*.

Civil Action No. 1:26-cv-02656 (CRC)

**PLAINTIFF'S REPLY IN SUPPORT OF ITS CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. Defendants' Response Mischaracterizes The NOFO And PPFA's Members' Resulting Injuries, And Relies On Meritless Savings Clause Arguments ........ 2

A. Defendants Mischaracterize The NOFO And PPFA's Members' Injury ........ 2

B. The Savings Clauses Do Not Save The NOFO ........ 4

II. PPFA Has Established Associational Standing On Behalf Of Its Injured Members ........ 6

III. The NOFO Violates the APA ........ 10

A. The NOFO's Requirements Are Contrary To Law ........ 10

B. The Alignment Requirements Exceed Agency Authority ........ 14

C. The NOFO's Requirements Are Arbitrary and Capricious ........ 16

D. Three Of The NOFO's Criteria Were Impermissibly Issued Without Notice And Comment ........ 20

IV. The NOFO's Alignment Requirements Violate The Spending Clause ........ 21

V. The Court Should Vacate The Unlawful Portions Of The NOFO And Permanently Enjoin Defendants From Enforcing Them ........ 23

VI. Conclusion ........ 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allied-Signal, Inc. v. United States Nuclear Regulatory Commission*, 988 F.2d 146 (D.C. Cir. 1993) ........ 24

*Barnes v. Gorman*, 536 U.S. 181 (2002) ........ 21

*Bennett v. Kentucky Department of Education,* 470 U.S. 656 (1985) ........ 22

*City and County of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ........ 4

*City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019) ........ 7

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022) ........ 21

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ........ 18

*Department of Homeland Security v. Regents of the University of California*, 591 U.S. 1 (2020) ........ 14

*FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ........ 19

*Federal Communications Commission v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ........ 17

*Flyers Rights Education Fund, Inc. v. Federal Aviation Administration*, 864 F.3d 738 (D.C. Cir. 2017) ........ 19

*Food and Drug Administration v. Wages and White Lion Investments, L.L.C.*, 604 U.S. 542 (2025) ........ 17

*Freedom Network v. Trump*, 830 F. Supp. 3d 681 (N.D. Ill. 2026) ........ 21, 22

*Harmon v. Thornburgh*, 878 F.2d 484 (D.C. Cir. 1989) ........ 23

*Heartland Regional Medical Center v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ........ 24

*Hennepin County v. Department of Health and Human Services*, 2026 WL 2426300 (D.D.C. Aug. 19, 2026) ........ *passim*

*HIAS, Inc. v. Trump*, 985 F.3d 309 (4th Cir. 2021) ........ 5

*ItServe Alliance, Inc. v. Department of Homeland Security*, 590 F. Supp. 3d 27 (D.D.C. 2022) ........ 6

*Kiakombua v. Wolf*, 498 F. Supp. 3d 1 (D.D.C. 2020) ........ 24

*League of United Latin American Citizens v. Executive Office of the President*, 780 F. Supp. 3d 135 (D.D.C. 2025) ........ 4

*Long Island Power Authority v. Federal Energy Regulatory Commission*, 27 F.4th 705 (D.C. Cir. 2022) ........ 24

*Mendoza v. Perez*, 754 F.3d 1002 (D.C. Cir. 2014) ........ 20

*Mi Familia Vota v. Fontes*, 129 F.4th 691 (9th Cir. 2025) ........ 6

*N.Y.C. C.L.A.S.H., Inc. v. Fudge*, 47 F.4th 757 (D.C. Cir. 2022) ........ 21

*National Council for Adoption v. Blinken*, 4 F.4th 106 (D.C. Cir. 2021) ........ 6

*National Endowment for the Arts v. Finley,* 524 U.S. 569 (1998) ........ 16

*New York v. Trump*, 811 F. Supp. 3d 215 (D. Mass. 2025) ........ 18

*Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993) ........ 9

*Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92 (2015) ........ 20

*Planned Parenthood of Greater Washington and North Idaho v. United States Department of Health and Human Services*, 946 F.3d 1100 (9th Cir. 2020) ........ 3

*Potter v. Toei Animation Inc.*, 839 F. Supp. 2d 49 (D.D.C. 2012) ........ 16, 19

*Refugee and Immigrant Center for Education and Legal Services v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) ........ 23

*San Francisco Unified School District v. AmeriCorps*, 789 F. Supp. 3d 716 (N.D. Cal. 2025) ........ 22

*Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356 (D.C. Cir. 1996) ........ 7

*Sherley v. Sebelius*, 610 F.3d 69 (D.C. Cir. 2010) ........ 9

*State v. Yellen*, 539 F. Supp. 3d 802 (S.D. Ohio 2021) ........ 22

*Summers v. Earth Island Institute,* 555 U.S. 488 (2009) ........ 9

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ........ 23

## STATUTES, RULES, AND REGULATIONS

42 C.F.R. § 59.2 ........ 11, 12

42 C.F.R. § 59.5 .......... 10, 12, 13

42 U.S.C. § 300 .......... 14, 15

Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025) .......... 11

**OTHER AUTHORITIES**

*Defining Sex*, U.S. Dep't of Health & Hum. Servs. (Feb. 19, 2025), https://perma.cc/KTY7-RRLD .......... 11

## INTRODUCTION

Defendants' NOFO requiring that applicants and funding recipients "align" with transparently political priorities—priorities that directly undermine the effective provision of Title X services and the purpose of the Title X program—violates the APA and exceeds the spending power of the federal government. Defendants attempt to construe the alignment requirements and priorities to say something other than what the plain text conveys, but this effort falls flat in light of the mountain of evidence, in the form of the White House's public statements, executive orders, and the HHS and OASH Priorities, confirming that the intended meanings of the NOFO's provisions are exactly what PPFA reads them to be.

Defendants sidestep the NOFO's numerous legal infirmities by mischaracterizing the NOFO, the law, and PPFA's members' harms. Defendants repeatedly claim that the NOFO sets up only scoring guidelines that do not impose disadvantages on PPFA's members and that the NOFO's savings clauses salvage the NOFO. Neither argument is successful. The NOFO establishes the parameters of what applicants are expected to propose, announces when Defendants will assess satisfaction of those requirements, and implements those requirements as a condition of securing and maintaining funding. Defendants hide behind savings clauses that merely add the phrases "where authorized by law" and "within the scope of the program" at various points in the NOFO.

Defendants' arguments regarding standing are equally deficient. Under a correct reading of the NOFO, the declaration submitted in support of PPFA's Motion, and applicable law, PPFA has demonstrated associational standing. It has identified members who are suffering competitive injury now from the NOFO's alignment mandates and their vagueness.

On the merits, Defendants selectively quote and distort the meaning of language within the Challenged Criteria and the HHS and OASH Priorities. Defendants' attempts to minimize

the NOFO's conflicts with the Title X regulations, its inherent vagueness, and numerous other flaws that violate the APA contradict the plain language of the NOFO and should be rejected. Further, Defendants fail to respond to many of PPFA's arguments (particularly those demonstrating that the Challenged Criteria are arbitrary and capricious), thus forfeiting those arguments. And they fail to show that the Challenged Criteria satisfy the Spending Clause.

Finally, Defendants argue that, should the Court grant PPFA relief against the Challenged Criteria and HHS and OASH Priorities, it should remand without vacatur, and in the alternative that any injunction should be limited to PPFA alone. But vacatur and injunctive relief against the NOFO's unlawful provisions would provide the only sufficient and appropriate relief. And injunctive relief that is limited to PPFA would not redress PPFA's injury because PPFA will be evaluated against other applicants still being assessed under the NOFO's unlawful provisions.

Defendants' arguments are without merit. The Court should grant summary judgment in favor of PPFA.

## ARGUMENT

### I. Defendants' Response Mischaracterizes The NOFO And PPFA's Members' Resulting Injuries, And Relies On Meritless Savings Clause Arguments

Defendants' legal arguments are flawed in numerous respects, each of which is dealt with below. Two overarching errors, however, infect Defendants' entire brief: a mischaracterization of the NOFO and the harms it presently inflicts on PPFA's members, and a flawed reliance on the NOFO's savings clauses to salvage defective agency action. Once those specious arguments are set aside, the Court can easily dispose of the remainder of Defendants' defenses.

#### A. Defendants Mischaracterize The NOFO And PPFA's Members' Injury

Defendants repeatedly reduce PPFA's challenge to a gripe with scoring criteria that, they argue, impose no requirements on applicants. *See, e.g.,* Dkt. 29 ("Defs' Opp.") 1, 4-6, 11-14.

From that premise, they argue that the suit is premature because applications have not been scored, *id.* 1, 15, 17-18; that applicants lack standing because they cannot show actual or imminent harm from a scoring criterion, *id.* 4-6, 11-12; that any conflict with law cannot be determined because the agency may ignore its pronouncements and apply the criteria in a lawful way, *id.* 16-17, 21; and that the agency need not speak in precise terms because the criteria are merely evaluative, *id.* 25-27.

Defendants' recharacterization of the NOFO is inaccurate, and all of the arguments that follow from that characterization therefore fail. The Challenged Criteria themselves speak in terms of requirements: Applicants "will be required to incorporate foundational body and health literacy into reproductive health counseling," Dkt. 26-3 ("AR") 82; clinics "are expected" to provide certain services, AR83; recipients are "required to" administer their projects in accordance with the Challenged Criteria, AR77; and the project narrative must outline their plans to do so, AR91. The NOFO's plain terms thus belie Defendants' contention that it only evaluates "the extent to which" an application advances the Challenged Criteria but does not "require" implementation, unlike in *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 946 F.3d 1100 (9th Cir. 2020) and *Hennepin Cnty. v. HHS*, 2026 WL 2426300 (D.D.C. Aug. 19, 2026). Defs' Opp. 6-7, 9. And as detailed in PPFA's opening brief, the NOFO concretely defines the role of the priorities. Dkt. 26-1 ("PPFA Br.") 10.

The challenged alignment requirements thus are not merely "one input to one of five stages." Defs' Opp. 15. Rather, they dictate what applicants must propose, how Defendants will evaluate an application, and whether a grantee will face corrective action. DOJ's efforts to derogate its own clients' actions into meaninglessness are unpersuasive.

### B. The Savings Clauses Do Not Save The NOFO

Defendants' justiciability and merits arguments also rely heavily on the NOFO's savings clauses, *see* Defs' Opp. 1, 13-17, 20-21, 23, 31, 33, which say without further explanation that Defendants will require alignment with the OPA, HHS, and OASH Priorities "where authorized by law" and where the priorities are "within the scope of the program." The NOFO does not specify which or what aspects (if any) of the priorities Defendants consider *not* authorized by law or *outside* the scope of the program, or how any applicant should reconcile priorities it deems not authorized by law or outside the scope of Title X. *See* AR77, 80, 111.

The savings clauses' qualifying language cannot "override [the NOFO's] clear and specific language" that "commands action" directly at odds with the Title X regulations—namely, alignment with the Challenged Criteria. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1239-1240 (9th Cir. 2018). Defendants argue that the savings clauses cure any conflict with law because the NOFO itself does not "unambiguously command" any action. Defs' Opp. 21. But as PPFA explained in its opening brief, PPFA Br. 10, and above, *supra* Section I.A., the NOFO *does* unambiguously command applicants to align with the Challenged Criteria.

Defendants also suggest that there are lawful means of reconciling the Challenged Criteria and the regulations such that the savings clauses actually mean something. But numerous cases analyzing savings clauses in the context of legislation and agency action make clear that where, as here, a challenged action "cannot possibly be implemented consistent with applicable law, a command to do so in a saving[s] clause is meaningless." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 176 (D.D.C. 2025); *see also* PPFA Br. 15-16, 24-27. Defendants have no contrary authority of their own and fail to effectively distinguish their argument from those that courts have consistently rejected.

The savings clauses also do nothing to resolve, and in fact only add to, the confusion that gives rise to PPFA's arbitrary and capricious claim. Nowhere does the NOFO explain how an entity is to determine that alignment with a particular priority is or is not "authorized by law." *See* AR68-133. The lack of any mechanisms for "invoking the savings clause[s] or any standards for applying [them]," renders them "purely theoretical," *HIAS, Inc. v. Trump*, 985 F.3d 309, 325 (4th Cir. 2021), and does nothing to give applicants fair notice as to how Defendants expect them to comply with the NOFO's directions. Furthermore, the savings clauses are not even included in all places where the NOFO requires alignment.[1] The NOFO provides no answers, and thus, in the end, the savings clauses do nothing to resolve the harm and confusion that PPFA's members currently face, and in fact compound it.

Likewise, the NOFO's attempt to limit the applicability of its alignment requirements to those that are "consistent with … the scope of the award" or "within the scope of the program" sets forth no standards giving applicants any indication which priorities Defendants consider to be outside "the scope." *See* AR68-133. This leaves applicants in the same position they would be without the savings clauses—forced to guess, and hope Defendants agree, not just now, but in the future if their applications are ultimately selected. In short, "without a procedure for invoking the savings clause[s] or any standards for applying [them], [this Court] cannot conclude that the clause[s] 'save[]' the [NOFO] from the infirmities," and Defendants' arguments to the contrary must be rejected. *HIAS, Inc.,* 985 F.3d at 325.

---

[1] For example, the NOFO instructs applicants to "[d]escribe plans and strategies for providing family planning services that address OPA program priorities," AR91, and informs applicants that 35% of their Merit Review points will be based on the extent to which they propose strategies that meaningfully advance "'OPA program priorities' and HHS's priorities," AR110, without qualification. It is unclear whether the absence of any "savings clauses" there means that they do not apply to those aspects of the application and review process.

## II. PPFA Has Established Associational Standing On Behalf Of Its Injured Members

PPFA has shown that its members who wish to apply for Title X funding under the NOFO, including those who are current Title X grantees with established programs, are competitively disadvantaged by the NOFO's unlawful alignment requirements. PPFA Br. 12-20. An order from this Court vacating and enjoining them would redress this injury. That is all that is required for PPFA to establish standing. Defendants' argument that PPFA has not adequately done so misunderstands both the nature of its members' injury and the law.

Defendants argue that PPFA has failed to identify any member that is injured or an "intended project" affected by the NOFO. They are wrong. PPFA has established through unrebutted declaration testimony that its members have a history of applying for and receiving Title X grants to operate Title X projects and would like to do so for the upcoming grant cycle, Dkt. 26-4 ("Clawson Decl.") ¶¶ 35-36, 78; that its members are subject to the NOFO's unlawful requirements that place them at a disadvantage in the grant competition for Title X projects and deprive them of adequate notice of the terms of competition and conditions for Title X grants, *id.* ¶¶ 79-85, 91; and that this harm would be addressed by the vacatur and enjoining of those requirements. That gives PPFA associational standing. Even if PPFA were required to identify by name particular members that intend to participate in the competition,[2] it has: "Some of PPFA's member affiliates would like to apply for Title X grants for fiscal year 2027, including

---

[2] It is far from clear that PPFA is required to identify by name a specific member that intends to apply under the NOFO. *See, e.g., Mi Familia Vota v. Fontes*, 129 F.4th 691, 709 (9th Cir. 2025) (concluding that plaintiff membership organization did not need to identify any injured member by name). But regardless of whether that is necessary, PPFA submits with this brief a declaration of Amanda Skinner, the President and CEO of Planned Parenthood of Southern New England to further bolster PPFA's associational standing as Exhibit 1. *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 112-13 (D.C. Cir. 2021) (holding that supplemental declarations are permissible where they support the original theory of standing); *ItServe Alliance, Inc. v. Dep't of Homeland Sec.*, 590 F. Supp. 3d 27, 35 (D.D.C. 2022) (finding no prejudice to defendant from supplemental declaration because it provided "more evidence for standing").

member affiliates currently receiving direct grants." Clawson Decl. ¶ 78; *see also id.* ¶ 36 (identifying by name the seven member affiliates receiving grants). Defendants conspicuously omit this last part of the sentence when citing the Clawson declaration. Defs' Opp. 8, 10.

Defendants' argument is just a repackaging of their foundational mischaracterizations. The requirement that PPFA's members align their proposed projects with the Challenged Criteria—and OASH and HHS Priorities—presently puts them at significant competitive disadvantage given their shared mission, values, and longstanding clinical practices, compared to other applicants that are willing and/or able to maximally align with the agency's priorities. Clawson Decl. ¶¶ 50-52, 63-64, 66-67, 78-79, 84-85; Ex. 1 ("Skinner Decl.") ¶¶ 9-11; *see also* AR161 (HHS memorandum stating that "[d]iscretionary grants [like Title X] should be given to a broad range of recipients rather than to a select group of repeat players"). For example, Planned Parenthood members will not, unless following the direction of their patients, promote marriage before parenthood, discourage patients from treating their symptoms with hormonal contraception, or encourage the use of natural family planning over other methods; they will not provide services that deny patients' gender identities; and they will continue to refer patients for abortions where requested. Clawson Decl. ¶¶ 60, 63, 66, 70; Skinner Decl. ¶¶ 9-11. The alignment requirements inflict competitive injury on PPFA's members who wish to apply. *See, e.g.*, *Hennepin Cnty.*, 2026 WL 2426300, at *10; *City of L.A. v. Barr*, 929 F.3d 1163, 1173 (9th Cir. 2019) (funding notice awarding points for choosing illegal immigration focus area disadvantaged plaintiff that could not do so "relative to other applicants that were able to choose the illegal immigration focus area"); *Scheduled Airlines Traffic Offs., Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996). Defendants cannot resolve that injury by depicting the requirements as hortatory rather than mandatory, contrary to the NOFO's plain terms.

Separately, Defendants' mischaracterization of the NOFO also underscores the impact of its vagueness, which separately injures PPFA's members. As PPFA showed in its opening brief, PPFA Br. 29-34, the NOFO's listed OPA Priorities are vague in several ways. They are vague on their face, *infra* Section III.C.; it is unclear whether and to what extent the OPA Priorities are "authorized by law and within the scope of the program," AR80; and it is unclear how applicants are expected to identify and reconcile the conflicts between the OPA Priorities and the law or any aspect of the priorities that go beyond the scope of the program. Likewise, while the NOFO requires alignment with OASH and HHS Priorities, AR77, 110-111, the NOFO never identifies which priorities Defendants have in mind, nor which are authorized by law and within the program's scope, nor how an applicant is to resolve any conflict between these priorities and the law or any aspect that goes beyond the scope of the program, *see* AR111. Therefore, PPFA's members are injured because they lack fair notice of what Defendants require of their proposals and funded projects. Clawson Decl. ¶¶ 52, 63, 67, 71-72, 75, 91; Skinner Decl. ¶¶ 12-13. This vagueness impairs their ability to prepare competitive applications; deprives them of the ability to decide knowingly whether to apply; invites arbitrary application of the requirements, particularly in light of the inconsistencies with governing law; and places them at risk of corrective action. *See, e.g.,* Clawson Decl. ¶¶ 79-85, 91; Skinner Decl. ¶¶ 12-13.

Contrary to Defendants' suggestion, the plaintiffs in *Hennepin County* did not establish standing by submitting more declarations;[3] they did so in the same way PPFA has here—by alleging concrete harms directly traceable to the funding instrument at issue. There, as here, "the injury in fact [wa]s an inability to compete on equal footing in a competitive grant application process, rather than the inability to actually secure a grant but-for some enumerated

---

[3] The *Hennepin County* plaintiffs submitted one declaration for each plaintiff, as here.

disadvantage." *Hennepin Cnty.*, 2026 WL 2426300, at *10. Defendants acknowledge that this type of injury suffices to establish standing. *See* Defs' Opp. 12 (in cases recognizing competitor standing "the plaintiff could show, from the instrument and the facts about itself, that it competed on worse terms today than yesterday"). Similarly, Defendants claim that PPFA failed to identify an "intended project," Defs' Opp. 5, but the Title X clinics identified in the Clawson declaration are funded by Title X and are the projects that PPFA's members will describe in their applications. As the declaration explains, *see* Clawson Decl. ¶ 91, the NOFO's terms are burdensome in part precisely because they make it impossible for members to know whether applying would be futile given their practices. *See Hennepin Cnty.*, 2026 WL 2426300, at *11.

Defendants' cases do not suggest a different result. In *Summers v. Earth Island Institute*, *see* Defs' Opp. 9-10, the Supreme Court found no associational standing in membership organizations' challenge to regulations exempting land management projects from the Forest Service's notice, comment, and appeal process. 555 U.S. 488 (2009). In stark contrast to the injuries PPFA has identified for its members that plan to apply for Title X grants, the *Earth Island* plaintiffs had not identified any member that planned to use land affected by exempted Forest Service projects, and the Court declined to rely on a statistical probability that, because the organizations had thousands of members in California, some had plans to visit such areas and thus suffer some harm by projects being undertaken there without notice, comment, or appeal. *Id*. at 497-498. PPFA does not rely on any such statistical supposition here; its member grantees want to apply for funding in the upcoming grant cycle but will be disadvantaged in doing so by the NOFO. *Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993)—which PPFA addressed at length in its opening brief, *see* PPFA Br. 19-20—and *Sherley v. Sebelius*, 610 F.3d 69, 72-74 (D.C. Cir. 2010), are of no help either.

Defendants concede, as they must, that "[n]either [of these cases] required proof of an unsuccessful bid, but both required showing how the challenged action altered the plaintiffs' competitive position." Defs' Opp. 3. That is exactly what PPFA has shown here. *See, e.g.*, Clawson Decl. ¶¶ 84-85, 91; Skinner Decl. ¶¶ 6, 9-13.

## III. The NOFO Violates the APA

### A. The NOFO's Requirements Are Contrary To Law

The Biological Reality, Anti-Contraception, and Marriage & Parenthood Counseling Criteria are contrary to law. PPFA Br. 24-27. Defendants' response to the contrary contorts the language of the criteria and requires the Court to ignore their obvious purposes and effects. Stripped of these mischaracterizations, the criteria's conflicts with the regulations are plain.

First, the Biological Reality Criterion states that the agency "will prioritize funding" for grantees that "respect[] biological reality," and that one of the key strategies for advancing this priority is "providing developmentally appropriate counseling rooted in biological science." AR83. The term "biological reality" is defined—in the HHS Priorities, AR144, which the OPA priority explicitly references, AR83—to advance a specific policy goal: "It is an HHS Priority to ensure our programs accurately reflect science, including the biological reality that a person's sex as either male or female is unchangeable and determined by objective biology." AR144.

There is a clear conflict between "respecting biological reality," as Defendants define it, and the Title X regulations requiring clinics to "[p]rovide services in a manner that does not discriminate against any client based on … sexual orientation, gender identity, [or] sex characteristics." 42 C.F.R. § 59.5(a)(4). A Title X project cannot advance or align with a "reality" that a person's sex is unchangeable from the one assigned at birth while simultaneously providing "inclusive" services that ensure "all people are fully included and can actively participate in and benefit from family planning, including, but not limited to … lesbian, gay,

bisexual, transgender, and queer (LGBTQ+) persons," *id.* § 59.2, and that are "respectful of, and responsive to, individual client preferences, needs, and values," which "guide all clinical decisions," *id.*, as the regulations require. Either a project provides inclusive services respecting a person's gender identity according to the regulations, or a project ignores (thereby derogating) a patient's gender identity when respecting "biological reality"—it cannot do both.[4]

Defendants posit that the Title X regulations "govern how projects treat clients" while the Criterion "governs the scientific basis of its counseling." Defs' Opp. 21-22. To the extent the proposed distinction is understandable, it is not viable. But the "scientific basis" of counseling by definition must affect how a project "treats" clients. And Defendants' retreat to a savings clause, Defs' Opp. 23, is unpersuasive for all the reasons discussed. *See supra* Section I.B. Indeed, Defendants argue circularly that to resolve any conflict between the Challenged Criteria and the regulations, applicants need look only to the "regulations themselves." Defs' Opp. 21.

Second, the Anti-Contraception Criteria "expect applicants to demonstrate" how projects will integrate practices to "promote … fertility awareness and reproductive health *without unnecessary medicalization or symptom suppression*." AR82 (emphasis added). Requiring projects to "reduc[e] overmedicalization" requires grantees to disfavor FDA-approved

[4] Both an HHS internal memorandum giving guidance regarding NOFOs and HHS's sex-based definitions reference Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government." AR176; *Defining Sex*, U.S. Dep't of Health & Hum. Servs. (Feb. 19, 2025), https://perma.cc/KTY7-RRLD. That Executive Order states that "'[g]ender ideology' … permit[s] the false claim that males can identify as and thus become women and vice versa." Exec. Order No. 14168, 90 Fed. Reg. 8615, 8615 (Jan. 30, 2025). The many documents issued by Defendants make clear what Defendants intended with the use of the term "biological reality" in the NOFO.

contraceptives in favor of natural family planning based methods. AR81-82.[5] But the Title X regulations require projects to "[p]rovide a broad range of acceptable and effective medically approved family planning methods," 42 C.F.R. § 59.5(a)(1), to "[p]rovide services without subjecting individuals to any coercion … to employ or not to employ any particular methods of family planning," *id*. § 59.5(a)(2), and to provide "client-centered" services, meaning care that is "responsive to[] individual client preferences [and] needs," *id*. §§ 59.2, 59.5(a)(3). A Title X project that "promote[s]" a certain method of birth control is putting a thumb on the scale in favor of a particular method while disregarding that individual client's preferences and needs.

Defendants are wrong in arguing that these Criteria do not "tell[] a project to offer less contraception [or] counsel against it," Defs' Opp. 23. A direction to integrate practices that promote fertility awareness and avoid "overmedicalization" and "symptom suppression" is a direction to offer less contraception. Indeed, integrating such practices necessarily directs providers to leave symptoms untreated when one purpose of contraceptive treatment is symptom suppression.[6] Defendants assert that the Criteria do not favor natural family planning but merely "expand" access to it, Defs' Opp. 19-20, 23-24; but "expanding" access to a method that projects are already required to offer necessarily prioritizes it at the expense of other methods.

---

[5] The companion OASH priority titled "Reducing overmedicalization in health care and increasing focus on optimal health and addressing underlying root causes" likewise refers directly to a "pervasive overreliance on pharmaceutical … interventions," meaning FDA-approved contraceptives, and states that it "will focus on the underlying causes of disease, including lifestyle modifications and other modalities." AR135.

[6] *See, e.g.*, *Providing Quality Family Planning Services in the United States: Recommendations of the U.S. Office of Population Affairs*, American Journal of Preventive Medicine at S55 (Revised 2024) ("Noncontraceptive indications for some methods [of contraception] include … menstrual management or suppression; and treatment of acne, premenstrual dysphoric disorder (PMDD), heavy or painful periods, polycystic ovary syndrome (PCOS), and endometriosis.").

Finally, the Marriage & Parenthood Counseling Criterion is contrary to the Title X regulations' requirements that projects provide client-centered services; give neutral, factual, and non-directive pregnancy counseling; and neither coerce nor discriminate against patients. The NOFO states that "program counseling *should* affirm marriage and parenthood as meaningful and valued components of adult life, particularly in counseling adolescents on long term reproductive goals" and that grantees "*are expected* to provide services that support individuals and families seeking to have children." AR83 (emphasis added). These are commands for clinics to endorse Defendants' ideological preferences regardless of their patients' preferences. Defendants claim that the Criterion "directs no client toward a choice, overrides no client's preferences, and conditions no service on sharing the view." Defs' Opp. 25. But Defendants admit that this Criterion dictates "how a subject is presented" to clients. *Id.* In other words, Defendants effectively concede that the Criterion directs providers to counsel clients based on Defendants' chosen viewpoint. The difference between counseling patients about the superiority of a lifestyle choice and "direct[ing]" them "toward a choice" is illusory at best. The Criterion requires Title X providers to tilt the scales to advance Defendants' policy, which is contrary to the Title X regulations that require that projects not discriminate based on marital status, 42 C.F.R. § 59.5(a)(4), offer pregnant patients neutral, factual information and non-directive counseling, *id.* § 59.5(a)(5), and provide "client-centered" services, *id.* § 59.5(a)(3).[7]

[7] Defendants also assert that the verb "align" is the linchpin that proves the NOFO does not require any Title X project to take any action. Defs' Opp. 20. According to Defendants, an applicant can "align" with an agency priority merely by "describing how a project's strategies advance it" without "adopting the agency's priority as the project's ordering of services." *Id.* There is little, if any, daylight between a strategy to "meaningfully advance" an agency priority and "adopting the agency's priority." To "meaningfully advance" a priority, an applicant must describe strategies to adopt practices that advance the priority.

Defendants respond by conjuring three "example projects"—all of which are entirely hypothetical and carefully crafted to fit their arguments—that purportedly would comply with both the Challenged Criteria and the regulations. Defs' Opp. 19-20. As an initial matter, Defendants' post-hoc assertions cannot cure the defects on the face of the NOFO. *See DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 21, 24 (2020). And in any event, these hypothetical projects rely on Defendants' revisionist interpretation of the NOFO—not what the NOFO actually says. For example, a "project that serves every client without regard to sexual orientation, gender identity, or sex characteristics," Defs' Opp. 20, plainly is inconsistent with the "Biological Reality" Criterion's actual requirement that Title X clinics recognize that "a person's sex, as either male or female, is unchangeable and determined by objective biology," AR135. Defendants cannot evade the NOFO's plain requirements by positing hypotheticals that self-evidently contravene the NOFO while stating, based purely on ipse dixit, that they do not contravene the NOFO.

**B. The Alignment Requirements Exceed Agency Authority**

Congress did not grant Defendants the authority to impose the NOFO's alignment requirements, which are outside the scope of and undermine the purpose of the Title X program. PPFA Br. 27-28. Each of Defendants' three arguments to the contrary fails.

*First*, Title X cabins HHS's authority to make grants and enter into contracts to "assist in the establishment and operation of voluntary family planning projects which shall offer a broad range of acceptable and effective family planning methods and services." 42 U.S.C. § 300(a). In making these grants, HHS must "take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance." *Id.* § 300(b). Even if HHS has authority to consider criteria beyond those articulated in the statute, Defs' Opp. 20, it does not

have authority to impose requirements that conflict with the purpose of the statute, conflict with existing regulations, or are outside the scope of the statute. *See* PPFA Br. 27-28. The alignment requirements do all three things. *See id.*; *supra* Section III.A. The Challenged Criteria do nothing to help establish or maintain family planning projects as intended by Congress—they actively hinder such establishment and maintenance. They also indisputably do nothing to further any of the four considerations laid out in § 300(b). That "§ 300(b)'s four considerations are mandatory, not exclusive," Defs' Opp. 20, does not mean that Defendants can impose conditions unrelated to the purpose of Title X.

*Second*, apparently in response to PPFA's observation that Defendants did "not purport to rely on any statutory authority" for the alignment requirements, PPFA Br. 27, Defendants invoke 42 U.S.C. § 300a-4(b), which they contend allows the Secretary to attach "such conditions as [he] may determine to be appropriate," Defs' Opp. 20. In full, Section 300a-4(b) reads: "Grants under this subchapter shall be payable in such installments and subject to such conditions as the Secretary may determine to be appropriate to assure that such grants will be effectively utilized for the purposes for which made." 42 U.S.C. § 300a-4(b). Section 300(a) supplies those "purposes." Properly understood, then, Section 300a-4(b) empowers the Secretary to attach conditions that further Title X's purpose—not frustrate it.

*Lastly*, Defendants again look to the savings clauses. Defs' Opp. 20-21. But the phrase "where authorized by law" does not immunize the alignment requirements, which, as already explained, are outside the scope of Title X's statutory grant of authority and directly conflict with the implementing regulations. To read the requirement to "align program design and activities with agency priorities" and the "authorized by law" disclaimer as Defendants suggest would require one or the other to carry no meaning. *See supra* Section I.B.

### C. The NOFO's Requirements Are Arbitrary and Capricious

Defendants do not grapple with the majority of PPFA's arbitrary-and-capricious contentions, thereby forfeiting them. The arguments Defendants do raise are meritless.

**Vagueness.** Defendants' brief does little to address the various ways that the Challenged Criteria and OASH and HHS Priorities are vague, as PPFA argued at length in its opening brief. *See* PPFA Br. 29-34. Among the various claims that Defendants do not address are PPFA's arguments that the Marriage & Parenthood Counseling Criterion is vague, *id.* 30; the "Biological Reality" Criterion is vague, *id.* 30-31; the "Life-Affirming Program Delivery" Criterion is vague, *id.* 31-32; and the directive to align with the OASH and HHS Priorities is doubly vague, *id.* 32-34.[8] Defendants thus have forfeited any opposition to these arguments. *See, e.g.*, *Potter v. Toei Animation Inc.*, 839 F. Supp. 2d 49, 53 (D.D.C. 2012) ("[A]n argument in a dispositive motion that the opponent fails to address in an opposition may be deemed conceded.").

Rather than address PPFA's substantive points, Defendants just rehash their argument that *NEA v. Finley*—not an APA case—forecloses relief. 524 U.S. 569 (1998). Under *Finley*, Defendants say, "evaluative criteria" enjoy a more lenient vagueness standard. Defs' Opp. 25; *see id.* 25-26. But there is nothing tentative or interlocutory about the challenged alignment requirements that must justify more lenient review, even if *Finley* applied. *See* PPFA Br. 21-22 (citing *Hennepin Cnty.*, 2026 WL 2426300, at *18). The NOFO requires applicants to align with these priorities and enforces compliance in various ways. *See supra* Section I.A. The fact that alignment is mandatory and expressly weighted distinguishes the NOFO from *Finley*, *see* PPFA Br. 34-35, as does the fact that the funding instrument in *Finley* involved terms that the Supreme

[8] With respect to the Anti-Contraception Criteria, Defendants point to the NOFO's definition of "optimal health" as "physical, mental, and social wellbeing" as evidence that it is not vague. Defs' Opp. 26. But the latter definition provides no more discernable guideposts than the former.

Court recognized were inherently vague, *see id.* 35. Here, the NOFO uses terms and concepts that are vague not because of the inherent nature of the funding scheme, but because Defendants have chosen not to adequately explain them. *See id.*

Like the NOFO at issue in *Hennepin County*, this NOFO sets out requirements that fail to identify what is required with ascertainable certainty. Defendants try to distinguish *Hennepin County* by claiming it is limited to scenarios "where recipients faced sanction for noncompliance" and where nonaligned applications are "categorically disqualif[ied] … alongside [grant] terminations." Defs' Opp. 27 (quoting *Hennepin Cnty.*, 2026 WL 2426300, at *11 (first alteration in original)). Not so. *Hennepin County* also addressed a challenge to the "issuance of … forward-looking FY 2026 NOFOS." *Id.* at *10. And *Hennepin County* nowhere suggests that its application of the vagueness analysis is related to whether a grant requirement is "categorically disqualifying." In any event, the NOFO's alignment requirements operate as disqualifiers regardless of how an application is scored, as described above. *Supra* Section I.A.

**Change in position.** Several of the Challenged Criteria conflict with Title X regulations and so depart from previous agency position. *See* PPFA Br. 35; *supra* Section III.A. The NOFO does not, as Defendants suggest, adequately "state[] a rationale for each" of them. Defs' Opp. 28. Even if it did, the APA does not permit Defendants merely to "announce[] [their] priorities … and state[] a rationale for each," as Defendants claim. *Id.* Rather, an agency must "display awareness that it is changing position." *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The NOFO does not do that.

Moreover, the Challenged Criteria conflict with the QFP, including by prioritizing natural family planning methods over pharmaceutical interventions and by jettisoning gender-inclusive

care. *See* PPFA Br. 36. Defendants characterize the departures from the QFP as mere "silences." Defs' Opp. 28. But that is incorrect. For example, as Defendants seemingly acknowledge, *id.*, the QFP requires providers to acknowledge a patient's pronouns, while the "Biological Reality" Criterion mandates that providers "respect[] biological reality" as the concept that "a person's sex as either male or female is unchangeable." AR144. Courts are "not required to exhibit a naiveté from which ordinary citizens are free," *Dep't of Comm. v. New York*, 588 U.S. 752, 785 (2019)—the "Biological Reality" Criterion plainly is designed to disadvantage applicants who provide evidence-based and inclusive care to transgender patients. Further, while the QFP directs providers to support patients who wish to use birth control methods, *see e.g.*, 2024 QFP at S55, the Anti-Contraception Criteria direct providers to avoid pharmaceutical interventions and "symptom suppression," AR82. This is not silence, and nowhere do Defendants acknowledge or explain these changes.

**Lack of reasoned explanation.** Defendants appear to concede that the NOFO provides no explanation for its requirement to align with the OASH and HHS Priorities. Defs' Opp. 29. Neither does the transmittal they cite without explanation. *Id.* 30.[9] While PPFA does not argue that the mere fact that the record "consists of only two emails with attachments" is dispositive, *id.*, the thinness of the administrative record is further indication of Defendants' failure to clear the APA's floor for reasoned decisionmaking. *See, e.g.*, *New York v. Trump*, 811 F. Supp. 3d 215, 240 (D. Mass. 2025) (noting, where the "administrative record consist[ed] of only two documents," that "this scant administrative record ma[de] clear … that the [agencies] ha[d] not

[9] Indeed, the transmittal includes no explanation at all other than referencing recent executive orders. AR149-151. Even if it had included some explanation, Defendants do not respond to PPFA's authorities, PPFA Br. 37 n.19, holding that reliance solely on an executive order is arbitrary and capricious.

'reasonably considered the relevant issues and reasonably explained the[ir] decision'" (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021))).

**Reliance on improper factors and failure to consider an important part of the problem.** Defendants do not answer PPFA's arguments that their "decision to require alignment with political criteria rests on factors that Congress never intended to be used" and "fails to consider how these criteria would undermine the core purpose of Title X." PPFA Br. 38. They therefore have forfeited any response to those arguments. *See Potter*, 839 F. Supp. 2d at 53.

**Counter to the evidence.** Defendants do not substantively respond to PPFA's argument that the evidence does not support the Marriage & Parenthood Counseling Criterion. PPFA Br. 38-39. Defendants contend that HHS has no obligation to identify evidence on this point because it is a proposition for which "scant empirical evidence can be marshaled." Defs' Opp. 29. But when an agency asserts that "[r]esearch demonstrates" the accuracy of its conclusions, Defs' Opp. 29; PPFA Br. 38, it must show its work. *See Flyers Rts. Educ. Fund, Inc. v. FAA*, 864 F.3d 738, 747 (D.C. Cir. 2017) ("[I]nformation critically relied upon by the agency that no one can see does not count."). With respect to the Anti-Contraception Criteria, Defendants do not contest PPFA's argument that studies cited in the NOFO "confirm[] the importance of contraception for women who are sexually active." PPFA Br. 39. Instead, they focus narrowly on one statement in one report that some "women [have] discontinued the pill because of dissatisfaction," including with side effects. Defs' Opp. 29. That self-evident statement alone does not support the mandate in the NOFO that women be counseled away from highly effective, FDA-approved contraceptives. The NOFO's mandates still run counter to evidence before the agency of the importance of contraceptives to many women.

**Reliance.** According to Defendants, the "reliance *Regents* and *Encino* protect is reliance on a policy a party has arranged its affairs around." Defs' Opp. 30. On this narrow point, PPFA agrees. PPFA's members have, for decades, relied on the government's providing Title X grants based on criteria compliant with statutory and regulatory requirements, such as providing quality healthcare to all patients regardless of their marital status, preferred method of reproductive care, or gender identity. Those priorities have suddenly changed, and Defendants failed to consider the impact that change has on organizations whose missions and services have adapted to decades of prior preference to the contrary and the patients who depend on those services.

### D. Three Of The NOFO's Criteria Were Impermissibly Issued Without Notice And Comment

The "Biological Reality," Marriage & Parenthood Counseling, and Anti-Contraception Criteria are legislative rules because they "adopt[] a new position inconsistent with existing regulations," *Mendoza v. Perez*, 754 F.3d 1002, 1021 (D.C. Cir. 2014), and have the "force and effect of law," *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015).

As discussed, these Challenged Criteria clearly conflict with Part 59, and therefore constitute a substantive revision to Title X's existing regulations. *See supra* Section III.A. They also have the "force and effect of law." Defendants claim that the merits review does "not bind the agency" because the agency retains discretion in a subsequent stage of the review process. Defs' Opp. 31. But as explained above, PPFA's challenge is not limited to the merits scoring of applications; it challenges Defendants' decision to require applicants and grantees to align with and advance political priorities that contravene Title X's legal requirements.

Defendants also assert that the alignment mandates do not bind applicants because applicants "may propose whatever lawful project they choose." Defs' Opp. 31. This self-evident fact is beside the point because applicants submit proposals to *compete for grant awards*.

And, as discussed, the NOFO expressly enumerates what an applicant must do to propose the most *competitive* project they can and retain any grant funding they receive, thus limiting an applicant's discretion in how they structure their project beyond merely ensuring it is "lawful."

## IV. The NOFO's Alignment Requirements Violate The Spending Clause

Although the NOFO requires alignment with the Challenged Criteria and OASH Priorities to receive funding, *see supra* Section I.A, and those alignment requirements are fatally vague, *see* PPFA Br. 29-35; *supra* Section III.C, Defendants contend that PPFA's Spending Clause claim fails because (1) the doctrine's application is limited to state funding recipients, (2) PPFA has not yet been offered funds, and (3) the alignment requirements are ascertainable because applicants will be held only to what they include in their application and alignment is required only "when authorized by law." Defs' Opp. 31-33. Each argument is wrong.

*First*, Defendants insist that the Spending Clause's clear notice requirement does not extend to PPFA because it is not a State, and "[t]he cases that have carried the contract analogy beyond States have done so to limit what a recipient can be made to pay … not to give an applicant a claim against the criteria by which a grant will be awarded." Defs' Opp. 32. But Defendants themselves cite three decisions involving municipalities or private parties, not a State. *See Barnes v. Gorman*, 536 U.S. 181 (2002); *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022); *N.Y.C. C.L.A.S.H. v. Fudge*, 47 F.4th 757 (D.C. Cir. 2022). The factual differences that Defendants rely on to distinguish these cases, relating to "what a recipient can be made to pay" and the "existing contracts" in *N.Y.C. C.L.A.S.H.*, Defs' Opp. 32, do not limit PPFA's ability to assert a Spending Clause claim here, and Defendants point to no holding from any court indicating otherwise. *Freedom Network v. Trump*, 830 F. Supp. 3d 681

(N.D. Ill. 2026), is yet another example of a case like this one, in which a nonprofit organization asserted a Spending Clause claim based on unconstitutional conditions in a NOFO.[10]

*Second*, Defendants argue that the Spending Clause does not apply because PPFA is not "[a] State with an offer on the table," making adjudication of its Spending Clause claim premature. Defs' Opp. 32-33. But courts have held that a funding recipient can bring a Spending Clause claim before it receives funds because "[i]t is [the governmental action], not the State accepting the money, that violates the Constitution." *State v. Yellen*, 539 F. Supp. 3d 802, 812 (S.D. Ohio 2021). *Freedom Network*, like this case, involved a challenge to grant conditions at the time of the plaintiff's application, not after an award was granted. *See* 830 F. Supp. 3d at 693. Although Defendants point out that *Freedom Network* involved a certification "on pain of False Claims Act liability," Defs' Opp. 32, that distinction is of no moment. That condition was just one of several the court included in its ruling that the plaintiff was likely to succeed on its Spending Clause claim, and moreover, Title X grantees are bound to the terms of the project they propose, as Defendants acknowledge. *See Freedom Network*, 830 F. Supp. 3d at 707.[11]

*Third*, Defendants maintain that the continuing requirement for grantees to align with agency priorities is ascertainable because "[i]t binds recipients to the project they designed and the agency approved, read against the regulations the NOFO incorporates and the award they accept. … A recipient cannot be 'unable to ascertain' a condition defined by its own approved

[10] Defendants are also wrong that the condition much be imposed by Congress rather than the Executive Branch. *See San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716, 744 (N.D. Cal. 2025) ("[T]he Spending Clause applies not only to Congress, but the agencies implementing spending legislation").

[11] *Bennett v. Kentucky Department of Education,* 470 U.S. 656 (1985) (cited at Defs' Opp. 32), dealt with a different set of facts. *Bennett* said nothing about whether a Spending Clause claim could be brought before funds were paid. The Court did not opine on facts not before it or indicate that the Spending Clause has no application in circumstances like PPFA's.

project." Defs' Opp. 33. While grantees are held to the terms of their proposed project, *see* Clawson Decl. ¶ 43; AR114, the NOFO nowhere limits the alignment requirements to just those terms. Rather, the NOFO separately requires *grantees* to align with agency priorities. Those priorities include HHS and OASH Priorities that appear not in the NOFO but on agency websites subject to change without notice. AR77, 110-111; PPFA Br. 9-10. Nor does the phrase "when authorized by law" make the condition ascertainable. As described above, this language only exacerbates confusion by obscuring the scope of the requirements. *See supra* Sections I.B, III.C.

## V. The Court Should Vacate The Unlawful Portions Of The NOFO And Permanently Enjoin Defendants From Enforcing Them

Vacatur of the NOFO's unlawful requirements and an injunction blocking Defendants from applying them is warranted. Defendants argue that any relief should not inure to "applicants who are not before the Court and who have not asked for that relief" and that relief must be tailored to the injury to PPFA's members. But the Supreme Court recently recognized that complete relief to a plaintiff may also incidentally benefit nonparties. *Trump v. CASA, Inc.*, 606 U.S. 831, 851-852 (2025). And that is always true of vacatur, which is a firmly established remedy for unlawful agency action under the APA. When "a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Mullin*, 174 F.4th 81, 119-120 (D.C. Cir. 2026) (recognizing same). "[T]he mere fact that a vacatur order may happen to confer a possible benefit upon other individuals who are not before the Court … is not a reason to conclude that the Court lacks the power to nullify the unlawful government practice" and "is wholly irrelevant to the determination of whether or not a standard

vacatur order is appropriate to remedy the violation of law." *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 53 (D.D.C. 2020). Defendants have identified no reason to depart from these standards.

The Court should also reject Defendants' argument that, should the Court determine that the defect is curable, it should remand without vacatur. Defs' Opp. 33. Although on rare occasions a court may remand without vacatur to remedy a curable error where the error is not "serious" and where vacatur could cause "disruptive consequences," *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993), in a typical case vacatur is appropriate where an agency violates the APA, *see Long Island Power Auth. v. FERC*, 27 F.4th 705, 717 (D.C. Cir. 2022). Here, remand without vacatur is inappropriate because the NOFO's deficiencies are not curable. In addition to conflicts with the law, the required explanation of the alignment requirements "is totally absent" and therefore "vacatur is indicated lest remand invite wholly post hoc rationalization." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 199 (D.C. Cir. 2009). Further, vacatur is the least disruptive option;[12] delaying final adjudication by

[12] This case differs fundamentally from outcomes the D.C. Circuit has previously found to warrant remand without vacatur. *See, e.g.*, *Allied-Signal*, 988 F.2d at 151 (finding that "the consequences of vacat[ur] may be quite disruptive" because "the Commission would need to refund ... fees collected ... [and] it evidently would be unable to recover those fees under a later-enacted rule."); *Heartland Reg'l Med. Ctr.*, 566 F.3d at 198 (holding that second *Allied-Signal* factor weighed against vacatur because vacating the rule "would have required HHS to make payments to those hospitals for [certain] years [in which the rule was in effect] and for any subsequent years until the agency repromulgated the same rule and gave an adequate reason for rejecting the alternatives").

remanding without vacatur would force a costly, imminent decision by PPFA's members about whether to apply for funding under the NOFO's unlawful requirements.[13]

Separate and in addition to vacatur, PPFA is entitled to a permanent injunction to prevent Defendants from considering the Challenged Criteria and HHS and OASH Priorities as part of this grant application process. Even if the alignment requirements are vacated, PPFA's members still risk irreparable harm from Defendants' assessing compliance with the requirements. *See* PPFA Br. 43-45. Defendants do not address or contest PPFA's entitlement to injunctive relief and have thus conceded any argument to the contrary. *See* Defs' Opp. 33. Defendants only passingly address PPFA's requested injunction in the context of arguing that it should not apply to non-parties. Defs' Opp. 33-34. But, for the same reasons described above, an injunction that applies to all applicants is necessary because PPFA members' injury will not be remedied if the terms of the Challenged Criteria apply to other applicants but not PPFA members.

Finally, Defendants separately "request an opportunity to address the appropriate scope of relief." Defs' Opp. 33. The Court should reject this request. Defendants have already submitted two briefs where they could have addressed the scope of relief. They did not do so.

## VI. Conclusion

The Court should grant PPFA's cross-motion for summary judgment and grant the relief requested in PPFA's Proposed Order.

---

[13] Defendants argue that "[v]acating the priorities after applicants have drafted to them would require the agency to reissue the criteria and re-notice every applicant within that window." Defs' Opp. 34. But vacatur of the priorities would not require the agency to reissue the criteria. The existing NOFO absent the Challenged Criteria and requirement to align with the HHS and OASH Priorities would remain, and the agency could assess applications without its unlawful provisions. Vacatur would not upset the current timetable and schedule for evaluating applications and awards so as to "put the program on hold and impact all prospective grantees." *Id.* Current applicants could still apply under the NOFO before January 11 and Defendants could evaluate them—absent the NOFO's unlawful alignment requirements—without disruption.

October 23, 2026

Respectfully submitted,

/s/ *Alan E. Schoenfeld*
ALAN E. SCHOENFELD (DC BAR NO. 1725277)
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(202) 663-6000
alan.schoenfeld@wilmerhale.com

SOFIA BROOKS (*pro hac vice*)
CHRISTOPHER R. STEVENSON (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
sofie.brooks@wilmerhale.com
chris.stevenson@wilmerhale.com

LEAH FUGERE (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
350 South Grand Ave, Suite 2400
Los Angeles, CA 90071
(213) 443-5300
leah.fugere@wilmerhale.com

DEEPA ALAGESAN (D.D.C. BAR NO. NY0261)
CAMILA VEGA (*pro hac vice*)
PLANNED PARENTHOOD FEDERATION
OF AMERICA, INC.
123 William Street
New York, NY 10038
(212) 541-7800
deepa.alagesan@ppfa.org
camila.vega@ppfa.org

PAUL R.Q. WOLFSON (DC BAR NO. 414759)
CARRIE Y. FLAXMAN (DC BAR NO. 458681)
ROBIN F. THURSTON (DC BAR NO. 1531399)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
pwolfson@democracyforward.org
cflaxman@democracyforward.org
rthurston@democracyforward.org

*Attorneys for Plaintiff Planned Parenthood Federation of America, Inc.*